# LA ABRA SILVER MINING COMPANY *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 29.  Argued February 20, 21, 23, 1899. — Decided December 11, 1899.

The Commissioners appointed under the treaty between the United States and Mexico concluded July 4, 1868, and proclaimed February 1, 1869, (15 Stat. 679), having differed in opinion as to the allowance of the claim of the La Abra Silver Mining Company, a New York corporation, against Mexico, the Umpire decided for that company and allowed its claim, amounting, principal and interest, to the sum of $683,041.32. Mexico met some of the instalments of the award and then laid before the United States certain newly discovered evidence which, it contended, showed that the entire claim of the La Abra Company was fictitious and fraudulent. The Secretary of State thereafter withheld the remaining instalments paid by Mexico, and upon examining the new evidence reported to the President that in his judgment the honor of the United States was concerned to inquire whether in submitting the La Abra claim to the Commission its confidence had not been seriously abused, and recommended that Congress exert its plenary authority in respect

of the disposition of the balance of the funds received from Mexico and remaining in the hands of the United States. Finally, Congress passed the act of December 28, 1892, (27 Stat. 409, c. 14,) by which the Attorney General was directed to bring suit in the name of the United States in the Court of Claims against the La Abra Company and all persons asserting any interest in the award of the Commission to determine whether that award was obtained, as to the whole sum included therein or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the company, or its agents, attorneys or assigns, and if so determined, to bar and foreclose all claim in law or equity on the part of the company, its legal representatives or assigns to the money or any such part thereof received from the Republic of Mexico for or on account of the award. By that act full jurisdiction was conferred on the Court of Claims, with right of appeal to this court, to determine such suit, to make all proper interlocutory and final decrees therein, and to enforce the same by injunction or other final process. The act further authorized the return to Mexico of any moneys paid by it on the award and remaining in the custody of the United States, if the issue of fraud was determined adversely to the company. If the decision was favorable to the company, it was made the duty of the Secretary of State to proceed with the distribution of the funds in his hands. The act of 1892 was presented to the President on December 20. Two days thereafter Congress took a recess until January 4, 1893. The President signed the bill on December 28, 1892. *Held:*

(1) That the act of 1892 was not invalid by reason of its having been signed during a recess of Congress. Whether the President can sign a bill after the final adjournment of Congress for the session was not decided;

(2) The suit brought by the Attorney General involved rights capable of judicial determination and was a "case" within the meaning of the clause of the Constitution extending the judicial power of the United States to all cases in law and equity arising under that instrument, the laws of the United States and the treaties made by it or under its authority. The act did not in any wise trench upon the constitutional functions of the President. Nor was it simply ancillary or advisory to him. Whatever decree was rendered by the Court of Claims was, unless reversed, binding and conclusive upon the United States and the defendants;

(3) The act was not liable to the objection that it was inconsistent with the principles underlying international arbitration. On the contrary, such legislation is an assurance in the most solemn and binding form that the Government of this country will exert all the power it possesses to enforce good faith upon the part of citizens who, asserting that they have been wronged by the authorities of another country, seek the intervention of their Government to obtain redress;

(4) This court was entitled to look at all the evidence in the cause on

the issue as to fraud, because the act did not contemplate a special finding by the Court of Claims of the ultimate facts established by the evidence;

(5) The question stated in the act of 1892 — whether the award in question " was obtained as to the whole sum included therein, or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the said La Abra Silver Mining Company, or its agents, attorneys or assigns " — is answered in the affirmative as to the whole sum included in the award.

THE questions involved in this case arose from a claim made by the La Abra Silver Mining Company, a New York corporation, for damages alleged to have been sustained in consequence of certain acts and omissions of duty upon the part of official representatives of the Republic of Mexico.

The claim was originally the subject of investigation by a Commission organized pursuant to a Convention between the United States of America and the Republic of Mexico concluded July 4, 1868, and proclaimed February 1, 1869. 15 Stat. 679.

An award was made by the Commission in relation to this claim, but it has been executed only in part — its full execution having been suspended by legislation in conformity with which the present suit was instituted to ascertain whether the award had been obtained by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the La Abra Company, its agents, attorneys or assigns. Act of December 28, 1892, c. 14, 27 Stat. 409.

It will conduce to a clear understanding of the questions to be determined if we state fully the circumstances that led to the organization of the Commission, and show how it came about that a court established by this Government took cognizance of a moneyed demand made by an American corporation against a foreign government.

By the above Convention of July 4, 1868, it was provided that all claims on the part of corporations, companies or private individuals, citizens of the United States or of the Republic of Mexico, arising from injuries to their persons or property committed by the authorities of the respective Gov-

ernments and presented to either Government for its inter-position with the other since the treaty of Guadalupe Hidalgo of February 2, 1848, and which remained unsettled or did not .arise out of any transaction prior to that date, as well as any other claims presented within the time prescribed in the Convention, should be referred to two Commissioners — one to be appointed by the President of the United States by and with the advice and consent of the Senate and the other by the President of the Mexican Republic.

The Commissioners were conjointly to investigate and decide the claims presented to their notice in such order and manner as they thought proper, but "upon such evidence or information only" as should "be furnished by or on behalf of their respective Governments." Where they failed to agree in opinion upon any individual claim, they were to call to their assistance an Umpire, who was to decide upon it finally and without appeal. It was competent for each Government to name one person to attend the Commissioners as its agent, to. present and support claims on its behalf and to represent it generally in all. matters connected with the investigation.

When every case presented had been decided by the Commissioners or the Umpire, the total amount awarded in favor of the citizens of one Government was to be deducted from that awarded to the citizens of the other Government, and the balance to the amount of three hundred thousand dollars was to be paid to the Government in favor of whose citizens the greater sum had been awarded, without interest or any other deduction than that specified in the Convention. The residue was to be paid in annual instalments not to exceed three hundred thousand dollars in any one year until the whole amount had been paid.

The contracting parties agreed to consider the result of the proceedings of the Commission as a full, perfect and final settlement of every claim upon either Government arising out of any transaction of a date prior to the ratification of the Convention and to give full effect to the decision of the Commission or the Umpire without objection, evasion or delay; and they further engaged that every such claim whether or not

presented to the notice of, made, preferred or laid before the Commission should from and after the conclusion of its proceedings be considered and treated as finally settled, barred and thereafter inadmissible.

The Commission was organized in the city of Washington and held its first meeting on the 31st day of July, 1869, Mr. William H. Wadsworth and Señor Don Miguel Maria de Zamacona being the Commissioners respectively, and Mr. J. Hubley Ashton and Mr. Caleb Cushing the agents respectively, on behalf of the United States and Mexico. Dr. Francis Lieber the first Umpire having died, he was succeeded by Sir Edward Thornton, who at that time was the British Minister accredited to the Government of the United States at Washington.

On the 23d day of February, 1870, Secretary Fish issued a circular referring to the Convention of 1868 and stating that the Department of State deemed it advisable to refer to the Joint Commission all claims of corporations and citizens of this country without special examinations of their merits. He took care to say that the Government thereby expressed no opinion either as to the merits of the claims presented or as to the principles of law to be invoked in their support. The responsibility of deciding questions of fact and law, he observed, rested with the Commissioners.

On the 17th day of March, 1870, the La Abra Company gave written notice to the Secretary of State that it claimed from Mexico $1,930,000 "for damages and losses suffered by it in consequence of the violence and outrages committed by the authorities of Mexico against the rights of said company in 1867 and 1868." It asked for the interposition of the Government of the United States with Mexico for the payment of that demand and requested that its claim and proofs thereafter to be produced be referred to the Commission for settlement. This notice was transmitted by the Secretary to the Commission.

Subsequently, June 14, 1870, the Company filed with the Commission a memorial of its claim stating the amount thereof to be $3,000,030. Before the case was finally heard the claim was increased to $3,962,000.

The period within which the Commission was to conclude its labors was from time to time extended by the two Governments. Of the claims presented by the United States there was allowed the sum of $4,125,622.30, while of the claims presented by Mexico the sum of $150,498.41 was allowed.

In respect of the claim of the La Abra Company the Commissioners differed in opinion and the case went to the Umpire for consideration.

The award of the Umpire, which was made December 27, 1875, embraced the following items as representing the damages sustained by the La Abra Company and to be paid by the Republic of Mexico: (1) On account of subscriptions and sales of stock, $235,000; (2) Money lent and advanced, $64,291.06; (3) Rent, expenses, salaries, law expenses, $42,500; (4) Amount derived from reduced ores, $17,000; (5) Ore extracted from the mines and deposited at the mills, $100,000; in all, $458,791.06. On $358,791.06, the aggregate of the first four items, the Umpire allowed interest from March 20, 1868, at six per cent, and upon $100,000, the fifth item, interest was allowed from March 20, 1869. The total amount of principal and interest allowed was $683,041.32.

An application was made to the Umpire by the Government of Mexico for a rehearing of the case, but a rehearing was denied.

Subsequently, the Mexican Government without at all disputing its obligation under the Convention of 1868 to comply with the award placed in the possession of the Secretary of State of the United States certain books, papers and documents which it alleged had been then recently discovered and would show that the claim of the La Abra Company was not only fictitious and fraudulent but had been supported by false and perjured testimony. At that time a large part of the sum awarded to the Company had been paid by Mexico and was in the hands of the Secretary of State. The distribution of the amount received had been delayed by the Secretary acting under the orders of the President to await legislation deemed necessary in order to make good to the fund the amount with which it was chargeable and

also because as stated by the Secretary it was desirable that the form and manner of the reservation from the instalment in hand of the expenses of the Government should first be settled.

These difficulties were met by the passage of the act of June 18, 1878, c. 262, 20 Stat. 144.

By the first section of that act the Secretary of State was authorized and required to receive all moneys paid by the Mexican Republic under and in pursuance of the Conventions of July 4, 1868, and April 29, 1876, and whenever and as often as any instalments should be paid by the Mexican Republic, to distribute the moneys received in ratable proportions among the corporations, companies or private individuals respectively in whose favor awards were made, or to their legal representatives or assigns except as in that act otherwise limited or provided, according to the proportion which the respective awards should bear " to the whole amount of such moneys then held by him, and to pay the same, without other charge or deduction than is hereinafter provided, to the parties respectively entitled thereto."

By the second section it was provided that " out of any moneys in the Treasury not otherwise appropriated a sufficient sum is hereby appropriated to enable the Secretary of the Treasury to pay to the Secretary of State of the United States, in gold or its equivalent, the equivalent of fifty thousand five hundred and twenty-eight dollars and fifty-seven cents in Mexican gold dollars and ten thousand five hundred and fifty-nine dollars and sixty-seven cents in American gold coin, and eighty-nine thousand four hundred and ten dollars and seventeen cents in United States currency, said sums being the aggregate in said currencies respectively of the awards made under the said Convention of July 4, 1868, in favor of citizens of the Mexican Republic against the United States, and having been deducted from the amount awarded in favor of the citizens of the United States, and payable by Mexico, in accordance with article four of the said treaty; and that said sums, when paid to the Secretary of State, as aforesaid, shall be regarded as part of the awards made under the said treaty, to be paid or distributed as herein provided."

The third section made provision for meeting out of the moneys received by the Secretary the expenses of the Commission including contingent expenses paid by the United States as ascertained and determined in pursuance of the provisions of the treaty.

The fourth section provided that in the payment of money in virtue of the act to any corporation, company or private individual, the Secretary of State should first deduct and retain or make reservation of such sums, if any, as might be due to the United States from any corporation, company or private individual in whose favor awards were made under the Convention.

The fifth section of the act was in these words: " And whereas the Government of Mexico has called the attention of the Government of the United States to the claims hereinafter named with a view to a rehearing, therefore be it enacted, that the President of the United States be, and he is hereby, requested to investigate any charges of fraud presented by the Mexican Government as to the cases hereinafter named, and if he shall be of the opinion that the honor of the United States, the principles of public law, or considerations of justice and equity require that the awards in the cases of Benjamin Weil and La Abra Silver Mining Company, or either of them, should be opened and the cases retried, it shall be lawful for him to withhold payment of said awards, or either of them, until such case or cases shall be retried and decided in such manner as the Governments of the United States and Mexico may agree, or until Congress shall otherwise direct. And in case of such retrial and decision, any moneys paid or to be paid by the Republic of Mexico in respect of said awards respectively shall be held to abide the event, and shall be disposed of accordingly; and the said present awards shall be set aside, modified or affirmed, as may be determined on such retrial: *Provided*, That nothing herein shall be construed as an expression of any opinion of Congress in respect to the character of said claims, or either of them." 20 Stat. 144, c. 262.

Pursuant to the direction of President Hayes the investi-

gation required by the fifth section of the act of June 28, 1878, was made by the Secretary of State.

Having reviewed all the proceedings of the Commission, including the testimony originally submitted to it, the supplemental evidence furnished in support of the allegations of fraud as to the Weil and La Abra claims, and the action theretofore taken by the Department of State, Secretary Evarts referred to the contention that in deciding against opening those awards diplomatically and reëxamining them by a new international commission, the whole discretion vested in the Executive as a part of the treaty-making power and under the special provisions of the act of Congress was exhausted, and that the payments in the cases referred to should be no longer suspended. He said that a solicitous attention to the rights of the claimants and the duty of the Executive in the premises had confirmed him in the opinion that Congress should determine whether "the honor of the United States" required any further investigation in these cases or either of them, and provide the efficient means of such investigation if thought necessary.

After stating the considerations which led him to that conclusion, the Secretary proceeded: "While these considerations led to the conclusion that these cases ought not to be made the subject of a new international commission, I was yet of opinion that 'the honor of the United States' was concerned to inquire whether in these cases, submitted by this Government to the Commission, its confidence had been seriously abused, and the Government of Mexico, acting in good faith in accepting a friendly arbitration, had been subjected to heavy pecuniary imposition by fraud and perjury in the maintenance of these claims, or either of them, before the Commission. In furtherance, however, of this opinion, it seemed to me apparent that the Executive discretion under the act of Congress could extend no further than to withhold further payments on the awards until Congress should, by its plenary authority, decide whether such an investigation should be made, and should provide an adequate procedure for its conduct, and prescribe the consequences which should follow

from its results.   Unless Congress should now make this dis-
position of the matter, and furnish thereby definite instruc-
tions to the Department to .reserve further payments upon
these awards till the conclusion of such investigation, and
to take such further order with the same thereafter as Con-
gress might direct, it would appear to be the duty of the
Executive to accept these awards as no longer open to recon-
sideration, and proceed in the payment of the same *pro rata*
with all other awards under the Convention." Senate Ex.
Doc. No. 150, 49th Cong. 2d Sess.

The suggestions of the Secretary having been approved by
the President, the first, second and third instalments of the
award received from Mexico on account of the claim of the
La Abra Company, amounting to $138,565.52, were paid to
the representatives of that Company.   Payments were subse-
quently made out of moneys received from Mexico, amounting
to $103,117.54, leaving in the possession of the United States
on account of the award $403,030.08.

After Mr. Arthur became President further distribution of
the money received was suspended because of the negotiation
of a treaty between the United States and Mexico for a
reëxamination of the Weil and La Abra cases.   This treaty
was signed on the 13th day of July, 1882, and was submitted
to the Senate for its approval, but after some delay it was
rejected by that body.

While that treaty was before the Senate, Key, as assignee
of part of the Weil claim and the La Abra Company filed
separate petitions in the Supreme Court of the District of
Columbia for a mandamus upon the Secretary of State com-
pelling him to pay to the petitioners their distributive shares
of the sums paid by Mexico in accordance with the terms of
the Convention of July 4, 1868.   In Key's case the writ asked
for was awarded, while in the La Abra case the petition was
dismissed.   The cases having been brought to this court, the
judgment in the Key case was reversed with direction to dis-
miss the petition and the judgment in the La Abra case was
affirmed.   *Frelinghuysen* v. *Key*, 110 U. S. 63.

Chief Justice Waite, delivering the judgment of this court,

said : " No nation treats with a citizen of another nation except through his government. The treaty, when made, represents a compact between the governments, and each government holds the other responsible for everything done by their respective citizens under it. The citizens of the United States having claims against Mexico were not parties to this convention. They induced the United States to assume the responsibility of seeking redress for injuries they claimed to have sustained by the conduct of Mexico, and as a means of obtaining such redress the convention was entered into, by which not only claims of citizens of the United States against Mexico were to be adjusted and paid, but those of citizens of Mexico against the United States as well. By the terms of the compact the individual claimants could not themselves submit their claims and proofs to the Commission to be passed upon. Only such claims as were presented to the Governments respectively could be ' referred' to the Commission, and the Commissioners were not allowed to investigate or decide on any evidence or information except such as was furnished by or on behalf of the Governments. After all the decisions were made and the business of the Commission concluded, the total amount awarded to the citizens of one country was to be deducted from the amount awarded to the citizens of the other, and the balance only paid in money by the government in favor of whose citizens the smaller amount was awarded, and this payment was to be made not to the citizens, but to their government. Thus, while the claims of the individual citizens were to be considered by the Commission in determining amounts, the whole purpose of the Convention was to ascertain how much was due from one government to the other on account of the demands of their respective citizens. As between the United States and Mexico, the awards are final and conclusive until set aside by agreement between the two governments or otherwise. Mexico cannot, under the terms of the treaty, refuse to make the payments at the times agreed on if required by the United States. This she does not now seek to do. Her payments have all been made promptly as they fell due, as far as these records show.

" As to the right of the United States to treat with Mexico for a retrial, we entertain no doubt. Each Government, when it entered into the compact under which the awards were made, relied on the honor and good faith of the other for protection as far as possible against frauds and impositions by the individual claimants. It was for this reason that all claims were excluded from the consideration of the Commission except such as should be referred by the several Governments, and no evidence in support of or against a claim was to be submitted except through or by the Governments. The presentation by a citizen of a fraudulent claim or false testimony for reference to the Commission was an imposition on his own Government, and if that Government afterwards discovered that it had in this way been made an instrument of wrong towards a friendly power, it would be not only its right but its duty to repudiate the act and make reparation as far as possible for the consequences of its neglect if any there had been. International arbitration must always proceed on the highest principles of national honor and integrity. Claims presented and evidence submitted to such a tribunal must necessarily bear the impress of the entire good faith of the government from which they come, and it is not to be presumed that any government will for a moment allow itself knowingly to be made the instrument of wrong in any such proceeding. No technical rules of pleading as applied in municipal courts ought ever to be allowed to stand in the way of the national power to do what is right under all the circumstances. Every citizen who asks the intervention of his own government against another for the redress of his personal grievances must necessarily subject himself and his claim to these requirements of international comity. None of the cases cited by counsel are in opposition to this. They all relate to the disposition to be made of the proceeds of international awards after they have passed beyond the reach of the governments and into the hands of private parties. The language of the opinions must be construed in connection with this fact." *Frelinghuysen* v. *Key*, 110 U. S. 63, 71–73.

Referring to the act of 1878, and observing that it did not

undertake to set any new limits on the powers of the Executive, the court further said : " From the beginning to the end it is, in form even, only a request from Congress to the Executive. This is far from making the President, for the time being, a *quasi* judicial tribunal to hear Mexico and the implicated claimants and determine once for all as between them whether the charges which Mexico makes have been judicially established. In our opinion it would have been just as competent for President Hayes to have instituted the same inquiry without this request as with it, and his action with the statute in force is no more binding on his successor than it would have been without. But his action as reported by him to Congress is not at all inconsistent with what has since been done by President Arthur. He was of opinion that the disputed cases should be further investigated by the United States to ascertain whether this Government has been made the means of enforcing against a friendly power claims of our citizens based upon or exaggerated by fraud, and, by implication at least, he asked Congress to provide him the means ' of instituting and furnishing methods of investigation which can coerce the production of evidence or compel the examination of parties or witnesses.' He did report officially that he had grave doubt as to the substantial integrity of the Weil claim and the sincerity of the evidence as to the measure of damages insisted upon and accorded in the case of La Abra Company. The report of Mr. Evarts cannot be read without leaving the conviction that if the means had been afforded, the inquiries which Congress asked for would have been further prosecuted. The concluding paragraph of the report is nothing more than a notification by the President that unless the means are provided, he will consider that the wishes of Congress have been met, and that he will act on such evidence as he has been able to obtain without the help he wants. From the statements in the answer of Secretary Frelinghuysen in the Key case, it appears that further evidence has been found, and that President Arthur, upon this and what was before President Hayes, has become satisfied that the contested decisions should be opened and the claims retried. Consequently, the Presi-

dent, believing that the honor of the United States demands it, has negotiated a new treaty providing for such a reëxamination of the claims, and submitted it to the Senate for ratification. Under these circumstances it is, in our opinion, clearly within the discretion of the President to withhold all further payments to the relators until the diplomatic negotiations between the two governments on the subject are finally concluded. That discretion of the Executive Department of the government cannot be controlled by the Judiciary. The United States, when they assumed the responsibility of presenting the claims of their citizens to Mexico for payment, entered into no contract obligations with the claimants to assume their frauds and to collect on their account all that, by their imposition of false testimony, might be given in the awards of the Commission. As between the United States and the claimants, the honesty of the claims is always open to inquiry for the purposes of fair dealing with the government against which, through the United States, a claim has been made." *Frelinghuysen* v. *Key*, 110 U. S. 63, 74, 76.

After the rejection of the treaty negotiated in 1882, President Cleveland in 1886 sent a message to the Senate calling attention to the act of 1878 and asking consideration of the status of the Weil and La Abra claims. By that message Congress was in substance notified that if it did not take some action in the matter the President would proceed to distribute the funds received from Mexico under the award and remaining in the hands of the United States. The matter having been referred to the Senate Committee on Foreign Relations it recommended the passage of a bill providing for a reinvestigation of those claims. The Committee's report on the subject thus concluded : " This brief résumé of the correspondence between the two Governments shows that Mexico, while observing, in good faith, all her obligations under the Convention, has earnestly and constantly urged upon the United States that these claims were fraudulent. This appeal to the spirit of justice cannot be ignored but should be met by a frank and open examination by our own courts of the facts presented by Mexico. These claimants have no vested rights

growing out of these claims which entitle them to come between Mexico and the United States, and to demand the payment of any part of these awards that are the outgrowth of fraud and perjury." Senate Doc. Report No. 2705, 50th Cong. 2d Sess.

No action having been taken by Congress, the subject was again mentioned in a message sent by the President to the Senate on the 5th of March, 1888, in response to resolutions of that body. The message was accompanied by a report from Mr. Bayard, Secretary of State, in which reference was made to the action of his predecessor. He said: "It is fair to assume that the rejection by the Senate of the treaty signed by Mr. Frelinghuysen, for an international rehearing of the awards, was in no sense an expression of opinion adverse to their investigation, which Mr. Evarts had recommended. It is rather to be regarded as an approval of the opinion which he also expressed, that the investigation should, under the circumstances, be made by this Government for itself, as a matter affecting solely its own honor. It is a remarkable fact that whenever, since the distribution of the Mexican fund was commenced, the deliberate judgment of the official authorized by Congress to make such distribution has been recorded upon the two awards in question, it has uniformly been to the effect that the evidences that the United States, in presenting the claims, had been made the victim of fraudulent imposition were of such a character as to require investigation by a competent tribunal, possessing appropriate powers for that purpose. . . . The sole question now presented for the decision of this Government is whether the United States will enforce an award upon which the gravest doubts have been cast by its own officers in opinions rendered under express legislative direction, until some competent investigation shall have shown such doubts to be unfounded, or until that branch of the Government competent to provide for such investigation shall have decided that there is no ground therefor." Senate Doc. Report No. 2705, 50th Cong. 2d Sess. The Secretary recommended that Congress take action providing expressly for the reference of the Weil and La Abra claims to the Court of

Claims or such other court as was deemed proper in order that a competent investigation of the charges of fraud might be made.

Pending the consideration of this matter in the Senate the Committee on Foreign Relations examined the evidence alleged to have been discovered by Mexico after the award in question, especially certain letters and copies of letters of the officers and agents of the La Abra Company contained in a letter-impression book that was not before the Commission. The Committee in their report to the Senate on March 1, 1889, among other things said: "The main allegation in the petition of the La Abra Company presented to the Mixed Commission, to wit, that the Company was dispossessed of its property by the forcible interference of the Mexican authorities, is disproved and shown to have been wholly false, and this mainly by the correspondence of the Company's own officers and agents; and it appears by the testimony taken by the Committee that the abandonment of the property and the failure of the Company were wholly due to the poverty of the mines and the consequent financial embarrassment of the Company." After reviewing, in the light of precedent and upon principle, the question of the power of Congress to order a reëxamination of the La Abra claim, the Committee concluded its report to the Senate: "It thus appears that the power of Congress to reopen the La Abra award, and to direct a suit to be brought to judicially determine whether or not it was procured by fraud, has been affirmed by successive Secretaries of State, assumed by Congress in the passage of the act of June 18, 1878, expressly declared by committees of both houses of Congress, and substantially held to exist by the highest judicial tribunal of this Government." Senate Doc. Report No. 2705, 50th Cong. 2d Sess.

Reference should here be made to *United States ex rel. Boynton* v. *Blaine*, 139 U. S. 306, 323–326, as announcing principles that affect certain questions arising in the present litigation. That case was commenced on the 23d day of November, 1889, in the Supreme Court of the District of Columbia. Boynton, the relator, as assignee of Weil, sought to

compel the Secretary of State to pay certain moneys received under the award made pursuant to the Convention of 1868. The mandamus asked for was refused and the petition of Boynton was dismissed. . That judgment was affirmed by this court. The present Chief Justice, delivering the unanimous judgment of the court, declared its adherence to the principles announced in *Frelinghuysen* v. *Key* above cited and among other things said : "As between nations, the proprietary right in respect to those things belonging to private individuals or bodies corporate within a nation's territorial limits is absolute, and the rights of Weil cannot be regarded as distinct from those of his Government. The Government assumed the responsibility of presenting his claim, and made it its own in seeking redress in respect to it. Under this convention it was the balance that was to be paid, after deducting from what was found in favor of one Government that which was found in favor of the other. So that the moneys paid in liquidation of that balance belonged to the United States, to be increased by appropriation to the extent of the amounts allowed Mexico, and the aggregate to be distributed to the claimants as might be provided." Again : "Congress in furnishing the auxiliary legislation needed to carry the results of the convention under consideration into effect, requested the President to so far investigate certain charges of fraud as to determine whether a retrial ought to be had. This inquiry might have resulted in reopening the awards as between the two nations, or in such reëxamination in a domestic forum as would demonstrate whether the honor of the United States required a different disposition of the particular amounts in question. The validity and conclusiveness of the awards remained unimpugned so long as they were permitted to stand, and the principle of *res judicata* could not be invoked against the United States by individual claimants while the controversy raised as to them remained in *fieri*. In *Frelinghuysen* v. *Key*, while conceding the essential value of international arbitration to be dependent upon the certainty and finality of the decision, the court adjudged that this Government need not therefore close its doors against an investigation into the question whether its

influence has been lent in favor of a fraudulent claim. It was held that no applicable rule was so rigid as not to be sufficiently flexible to do justice, and that the extent and character of any obligation to individuals, growing out of a treaty, an award and the receipt of money thereon, were necessarily subject to such modification as circumstances might require. So long as the political branch of the Government had not lost its control over the subject-matter by final action, the claimant was not in a position, as between himself and his Government, to insist on the conclusiveness of the award as to him. And while it is true that for the disposition of the case of *Frelinghuysen* v. *Key* it was sufficient that it appeared that diplomatic negotiations were pending which, as the court demonstrated, the act of 1878 in no manner circumscribed, it does not follow that the political department of the Government lost its control because those negotiations failed. On the contrary, that control was expressly reserved, for it was made the duty of the President, if of opinion that the cases named should be retried, to withhold payment until such retrial could be had in an international tribunal, if the two Governments so agreed; or in a domestic tribunal if Congress so directed, and, at all events, until Congress should otherwise direct. The fact that a difference of views as to whether a retrial should be international or domestic may have arisen and led to delay, or that such difference may have existed on the merits, does not affect the conclusion. The inaction by Congress is not equivalent to a direction by Congress. The political department has not parted with its power over the matter, and the intervention of the judicial department cannot now be invoked."

This brings us in the orderly statement of the history of this dispute to the act of December 28, 1892, c. 14, 27 Stat. 409, amending and enlarging the above act of June 18, 1878.

That statute recited that the Secretary of State, after investigating the charge of fraud presented by the Mexican Government as to the case of the La Abra Silver Mining Company, had reported that the honor of the United States required that case to be further investigated by the United States to ascer-

tain whether this Government had enforced against a friendly power claims of its citizens based upon or exaggerated by fraud, but that the executive branch of the Government " was not furnished with the means of instituting and pursuing methods of investigation which could coerce the production of evidence or compel the examination of parties and witnesses;" that " the authority for such an investigation must proceed from Congress;" and that the President of the United States had transmitted to Congress the recommendation of the Secretary of State that the case be referred to the Court of Claims, or such other court as might be deemed proper, in order that the charge of fraud made in relation to this claim might be fully investigated.   It was therefore enacted:

" That in further execution of the purpose of said act, the Attorney General of the United States be, and he is hereby, authorized and directed to bring a suit or suits in the name of the United States in the Court of Claims against La Abra Silver Mining Company, its successors and assigns, and all persons making any claim to the award or any part thereof in this act mentioned, to determine whether the award made by the United States and Mexican Mixed Commission in respect to the claim of the said La Abra Silver Mining Company was obtained, as to the whole sum included therein, or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the said La Abra Silver Mining Company, or its agents, attorneys or assigns; and, in case it be so determined, to bar and foreclose all claim in law or equity on the part of said La Abra Silver Mining Company, its legal representatives or assigns, to the money, or any such part thereof, received from the Republic of Mexico for or on account of such award; and any defendant to such suit who cannot be found in the District of Columbia shall be notified and required to appear in such suit by publication as the court may direct, in accordance with law, as applicable to cases in equity.

" § 2.   That full jurisdiction is hereby conferred on the Court of Claims to hear and determine such suit and to make all interlocutory and final decrees therein, as the evidence may

warrant, according to the principles of equity and justice, and to enforce the same by injunction or any proper final process, and in all respects to proceed in said cause according to law and the rules of said court, so far as the same are applicable. And the Secretary of State shall certify to the said court copies of all proofs admitted by the said Mixed Commission on the original trial of said claim, and the said court shall receive and consider the same in connection with such competent evidence as may be offered by either party to said suit.

"§ 3. That an appeal from any final decision in such cause to the Supreme Court of the United States may be taken by either party within ninety days from the rendition of such final decree, under the rules of practice which govern appeals from said court; and the Supreme Court of the United States is hereby authorized to take jurisdiction thereof and decide the same.

"§ 4. That in case it shall be finally adjudged in said cause that the award made by said Mixed Commission, so far as it relates to the claim of La Abra Silver Mining Company, was obtained through fraud effectuated by means of false swearing, or other false and fraudulent practices of said Company or its assigns, or by their procurement, and that the said La Abra Silver Mining Company, its legal representatives or assigns, be barred and foreclosed of all claim to the money or any part thereof so paid by the Republic of Mexico for or on account of such award, the President of the United States is hereby authorized to return to said Government any money paid by the Government of Mexico on account of said award, remaining in the custody of the United States, that has not been heretofore distributed to said La Abra Mining Company or its successors and assigns, which such court shall decide that such persons are not entitled, in justice and equity, to receive out of said fund.

"§ 5. That, during the pendency of said suit and until the same is decided, it shall not be lawful for the Secretary of State to make any further payments out of said fund, on account of said award, to La Abra Silver Mining Company,

or its legal representatives, attorneys or assigns; and in case it shall be finally adjudged in said cause in either the Court of Claims or in the Supreme Court of the United States that the award made by said Mixed Commission, so far as it relates to the claim of La Abra Silver Mining Company, or any definable and severable part thereof, was not obtained through fraud as aforesaid, then the Secretary of State shall proceed to distribute so much of the said award as shall be found not so obtained through fraud, or the proceeds thereof remaining for distribution, if any, to the persons entitled thereto." 27 Stat. 409, c. 14.

Pursuant to the provisions of that act the Attorney General brought the present suit in the Court of Claims. The defendants are the La Abra Company and numerous individuals who assert some interest in the award made in respect of its claim against Mexico. The relief asked by the United States is indicated by the following paragraph in the bill:

" Your orator further shows, that by reason of the premises a controversy has arisen between your orator and the defendants hereinbefore named, the said defendants claiming that it is the duty of your orator to pay over to them the sums by them, the said defendants, claimed respectively from the proceeds of said award now in the possession of your orator, and your orator claiming that it is the right and duty of your orator to have the facts relating to said claim and award inquired of by your honorable court, and if it shall be adjudged by your honorable court that the said award was obtained through fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the said defendant La Abra Silver Mining Company, or its agents, attorneys or assigns, to return the proceeds of said award to the said Republic of Mexico; that the said defendants have made persistent demands upon the Department of State and upon the Congress of your orator for the payment to them of said moneys, and that some of the said defendants have brought suits in the courts of your orator to compel such payment, and that, unless restrained by the judgment and decree of this honorable court, the said defendants will continue to

harass and annoy your orator with such demands and suits. . . . And that the said defendants and each and every one of them may, by the decree of this honorable court, be forever restrained and enjoined from setting up any claim to any part of said award or of the moneys now, as aforesaid, in possession of your orator. And that the said award on the claim of the said defendant La Abra Silver Mining Company may, by the decree of this honorable court, be declared to have been wholly obtained by means of false swearing and other false and fraudulent practices on the part of said defendant company, its agents, attorneys and assigns. And that your orator may have such other and further relief as the nature of your orator's case may require and as may be agreeable to equity and good conscience."

The La Abra Company and other defendants demurred to the bill on the following grounds:

That by the Constitution and laws of the United States the subject-matter of this suit was within the final and exclusive control of the Executive Department of the Government of the United States and not within the jurisdiction of any judicial tribunal;

That the questions whether the award of the Commission was obtained by fraud and whether the money received under it and remaining undistributed by the Secretary of State should be returned by the President of the United States could not properly be determined by any municipal court of either of the sovereign parties to the treaty of 1868, but were questions of a diplomatic or political nature determinable only by the Executive Department of the Government;

That the United States had not such an interest in the matters and things alleged in the bill as entitled it to maintain this suit or to have the relief asked;

That the Government of Mexico was the party pecuniarily interested in this suit, and that by failing to institute and prosecute suit against the alleged wrongdoers in the courts of the United States for the annulment of the award and the recovery of the moneys paid on account thereof, it had been guilty of laches and had forfeited all right to relief in equity;

consequently, the United States was not entitled to demand such relief for the benefit of or in the interest of Mexico;

That a mixed commission created and acting under and by virtue of such a treaty as that of July 4, 1868, between the United States and Mexico, was recognized by the law of nations and by the Constitution and laws of the United States and was in fact and law a court of exclusive and final jurisdiction, and its award could not be set aside, reopened or vacated by a municipal court of the United States, either in virtue of an act of Congress or otherwise, and that Congress could not grant a new trial in respect of matters so finally determined and concluded by international arbitration under such a treaty; but on the contrary, such an award could, on the part of the United States, be set aside, vacated or reopened only through its treaty-making power; and that the question presented by the bill, whether the award should be reopened or not on the grounds alleged, having been submitted to the treaty-making power and by it decided in the negative was *res judicata;*

That it appeared on the face of the bill that the question whether the award in favor of the La Abra Company was obtained in whole or part by fraud effectuated by means of false swearing or other corrupt and fraudulent practices was substantially the same question that was tried by the Commissioners, such fraud and fraudulent practices having been charged by the Mexican Agent and Commissioner at the trial; and that that question, on the disagreement of the two Commissioners in respect of the integrity of the witnesses and the credibility and weight of the evidence for and against the claim of the Company, was referred to the Umpire for decision, and having been decided by him was *res judicata* and could not be reëxamined or redetermined by this court;

That the act of Congress under which the suit was prosecuted was unconstitutional and inoperative on the further ground that it assumed to direct, control and bind the courts in determining the questions submitted for final adjudication to receive evidence and apply legal principles that were erroneous and wholly inadmissible according to law as administered

in the courts of the United States in like cases, and to prescribe to the court what weight and effect should be given to the evidence and how the court should reach the conclusion that the award was obtained in whole or in part through fraud;

That inasmuch and because the questions presented by the bill were of a political and diplomatic nature and not justiciable or fit and proper to be considered and finally determined by a municipal court, Congress could not impose upon the Court of Claims or upon the Supreme Court of the United States or upon the judges thereof, the trial and determination of those questions;

That the act of Congress in question was inoperative and void on the further ground that it was never approved by the President of the United States as required by law, the only alleged approval it ever received being on the 28th of December A.D. 1892, when Congress was not in session, both Houses of Congress having adjourned on the 22d of December A.D. 1892 to the 4th of January A.D. 1893; and,

That the bill did not state facts sufficient to constitute a cause of action or to authorize the granting of any relief.

The demurrer to the bill so far as it involved the jurisdiction of the Court of Claims and the charges of fraud was overruled, the opinion of the court being delivered by Judge Weldon. 29 C. Cl. 432, 484. The question whether the act of December 28, 1892, was so approved by the President as to become a law was determined in favor of the United States, upon the grounds stated in the opinion of the court previously delivered by Judge Nott, now Chief Justice of that court, in *United States* v. *Weil*, 29 C. Cl. 523.

The case having been prepared on the merits, the Court of Claims upon final hearing found that the award made by the Commission on the claim of the La Abra Company "was obtained as to the whole sum included therein by fraud effectuated by means of false swearing and other false and fraudulent practices on the part of said Company and its agents;" and it was adjudged that all claims in law and equity on the part of the Company, its legal representatives

and assigns, be forever barred and foreclosed in respect of the money received from the Republic of Mexico for or on account of such award. 32 C. Cl. 462, 520, 521.

An elaborate opinion of the Court of Claims, delivered by Judge Weldon, states fully the grounds on which the decree was based. That opinion concludes: "The court upon an examination of all the testimony, excluding such portions of it as in the opinion of the court are not competent, determines as a conclusion of fact that the La Abra Silver Mining Company did not abandon its mines in Mexico because of the interference of the people of Mexico and the public authorities of the Mexican Government, or either, but on the contrary that it abandoned its mines because they were unproductive and for the want of money to operate and work the same, and that the award made by the United States and the Mexican Mixed Commission in respect to the claim of the said La Abra Silver Mining Company was obtained as to the whole sum included therein by fraud effectuated by means of false swearing and other fraudulent practices upon the part of said company and its agents, and a decree will be entered barring and foreclosing all claim in law and equity on the part of said Company, or its agents, attorneys and assigns, to the money received from the Republic of Mexico for or on account of such award. Having decided that the Company was not compelled to abandon its mines because of the acts of the people of Mexico, unrestrained by the Mexican Government, and that it was not compelled to abandon the mines because of the unlawful interference of the Mexican authorities with the property and business of the Company, it is not necessary to consider the question of the value of the property of the Company at the time of the abandonment."

Chief Justice Nott dissented in part from the judgment. He was of opinion that the first three items in the award of the Umpire, above set forth, should stand, but that the fourth item was fraudulently exaggerated and should be reduced to $420.09, and the fifth, $100,000, rejected altogether as having been utterly overthrown by the evidence. 32 C. Cl. 521, 533.

From the judgment of the Court of Claims the present appeal was prosecuted.

*Mr. Jeremiah M. Wilson* for the La Abra Silver Mining Company.

*Mr. William A. Maury*, Special Assistant to the Attorney General, for the United States.

*Mr. Crammond Kennedy* (upon whose brief were *Mr. Wilson*, *Mr. John C. Fay* and *Mr. E. L. Renick*) closed for the La Abra Company. His brief contained the following points, supported by the accompanying citations of cases.

I. The Court of Claims has no jurisdiction over this matter, because it is not a "case" within the meaning of the Constitution, nor is it a "controversy" to which the United States is a party: citing 5 Wheat. App., Note 1, pp. 16 & 17; *Cohens* v. *Virginia*, 6 Wheat. 264; *Osborn* v. *Bank of the United States*, 9 Wheat. 738; *Georgia* v. *Stanton*, 6 Wall. 50; *Cherokee Nation* v. *Georgia*, 5 Pet. 1; *Murray* v. *Hoboken Land & Improvement Co.*, 18 How. 272; *Gordon* v. *United States*, 117 U. S. 697; *Chisholm* v. *Georgia*, 2 Dall. 419; *Smith* v. *Adams*, 130 U. S. 167; *Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 518; *Curtner* v. *United States*, 149 U. S. 662, and cases cited; *Frelinghuysen* v. *Key*, 110 U. S. 63.

II. Neither the Court of Claims nor this court has jurisdiction of the bill, because it seeks to review and reverse the action heretofore taken by the President of the United States in a matter of international concern exclusively within his discretion and control: citing *Frelinghuysen* v. *Key, supra;* *De Bode* v. *The Queen*, 3 Clark's H. L. Cas. 459; *Williams* v. *Suffolk Ins. Co.*, 13 Pet. 415; *Milnor* v. *Metz*, 16 Pet. 221; *United States* v. *Diekelman*, 92 U. S. 520; *Boynton* v. *Blaine*, 139 U. S. 306; *Marbury* v. *Madison*, 1 Cranch, 137; *Jones* v. *United States*, 137 U. S. 202; *Kilbourn* v. *Thompson*, 103 U. S. 168; *Sinking Fund cases*, 99 U. S. 700; *Martin* v. *Mott*, 12 Wheat. 19; *Luther* v. *Borden*, 7 How. 1; *Murray* v. *Hoboken Land & Improvement Co.*, 18 How. 272; *White* v. *Hart*,

13 Wall. 646; *Phillips* v. *Payne,* 92 U. S. 130; *United States* v. *Lee,* 106 U. S. 196; *Underhill* v. *Van Cortlandt,* 2 Johns. Ch. 339.

III. Neither the Court of Claims nor this court has jurisdiction of this suit, because it requires a collateral inquiry to be made into the merits of an international award rendered by a tribunal of exclusive and final jurisdiction; citing *Meade* v. *United States,* 9 Wall. 691; *Comegys* v. *Vasse,* 1 Pet. 193; *Michaels* v. *Post,* 21 Wall. 398; *Noble* v. *Union River Logging Co.,* 147 U. S. 165; *Boynton* v. *Blaine,* 139 U. S. 306; *In re Sanborn,* 148 U. S. 222.

IV. The appellate jurisdiction of this court, if it exists, involves and requires a review of the facts, citing *Harvey* v. *United States,* 105 U. S. 671; *United States* v. *Old Settlers,* 148 U. S. 427; *In re Neagle,* 135 U. S. 1.

V. If this appeal is dismissed for want of jurisdiction the decree of the Court of Claims will be null and void, and unavailable for any purpose whatever, citing *Ex parte Siebold,* 100 U. S. 371; *United States* v. *Yale Todd,* reported in a note to *United States* v. *Ferreira,* 13 How. 40, 52, 54.

VI. The Court of Claims erred in not dismissing the bill when it found as a matter of fact that the Mexican Government, by the exercise of the same diligence which it exercised after the adjournment of the Commission, could have obtained the so-called newly discovered evidence, and used it while the claim was pending before the Commission; citing *Western Cherokee Indians* v. *United States,* 27 C. Cl. 1; *Dexter* v. *Arnold,* 2 Mason, 303; *Barnett* v. *Smith,* 5 Call, (Virginia) 98; *Todd* v. *Barlow,* 2 Johns. Ch. 551; *Livingston* v. *Hubbs,* 3 Johns. Ch. 124; *Lansing* v. *Albany Ins. Co.,* 1 Hopk. Ch. 102; *Allen* v. *Ranney,* 1 Conn. 569; *Dulin* v. *Caldwell,* 29 Georgia, 362; *Elliott* v. *Adams,* 8 Blackf. 103; *Cook* v. *McRoberts,* 5 Ky. Law Reporter, 764; *Aubel* v. *Ealer,* 2 Bin. 582; *Plymouth* v. *Russell Mills,* 89 Mass. 438; *Young* v. *Keighly,* 16 Ves. 349; *Poullain* v. *Poullain,* 79 Georgia, 11; *Kennedy* v. *Georgia State Bank,* 8 How. 586; *Life Ins. Co.* v. *Bangs,* 103 U. S. 782; *Wood* v. *Carpenter,* 101 U. S. 135; *Smith* v. *Clay,* 3 Brown Ch. 639; *Cooke* v. *United States,* 91 U. S. 389; *United States* v.

*Bank of the Metropolis,* 15 Pet. 377; *United States* v. *Hancock,* 30 Fed. Rep. 851; *United States* v. *Barker,* 12 Wheat. 559; *United States* v. *Bank of the Metropolis,* 15 Pet. 377; *Pennsylvania* v. *Wheeling Bridge Co.,* 13 How. 518.

VII. The Court of Claims erred in not dismissing the bill on the ground that its allegations relate solely to issues passed upon by the Mixed Commission when it examined the claim of La Abra Company, and that the so-called newly discovered evidence is merely cumulative upon issues already tried, and does not show, or tend to show, the kind of fraud for which equity will grant relief: citing *Ross* v. *Wood,* 70 N. Y. 8; *Coltzhausen* v. *Kerting,* 29 Fed. Rep. 828; *Moffat* v. *United States,* 112 U. S. 24; *United States* v. *Flint,* 4 Sawyer, 52; *Livingston* v. *Hubbs,* 3 Johns. Ch. 124; *Southard* v. *Russell,* 16 How. 547.

VIII. The Company had in the award a vested right of property of which the bill seeks to deprive it without just compensation or without due process of law : citing *Gracie* v. *New York Insurance Co.,* 8 Johns. 237; *Comegys* v. *Vasse,* 1 Pet. 193; *Phelps* v. *McDonald,* 99 U. S. 298; *Emerson* v. *Hall,* 13 Pet. 409; *Milnor* v. *Metz,* 16 Pet. 221; *Mayer* v. *White,* 24 How. 317; *Bachman* v. *Lawson,* 109 U. S. 659; *United States* v. *Diekelman,* 92 U. S. 520; *United States* v. *Weld,* 127 U. S. 51; *Williams* v. *Heard,* 140 U. S. 529; *Frelinghuysen* v. *Key,* 110 U. S. 63; *Bank of Columbia* v. *Okely,* 4 Wheat. 235; *Giozza* v. *Tiernan,* 148 U. S. 657; *Duncan* v. *Missouri,* 152 U. S. 377; *Missouri Pacific Railway Co.* v. *Mackey,* 127 U. S. 205; *Leeper* v. *Texas,* 139 U. S. 462; *Hurtado* v. *California,* 110 U. S. 576; *Murray* v. *Hoboken Land & Improvement Co.,* 18 How. 272.

IX. The Court of Claims erred in not dismissing the bill on the ground that the alleged fraud was neither properly charged nor proved by the complainant.

MR. JUSTICE HARLAN, after stating the case as above, delivered the opinion of the court.

In the light of this history of the claim of the La Abra

Company we proceed to the consideration of such of the principal questions presented in argument as are essential to the disposition of the case.

I. If, as insisted by the appellants, the above act of December 28, 1892, was not so approved by the President as to become under the Constitution a law, it would be unnecessary to consider any other question raised by the pleadings; for that act is the only basis of jurisdiction in the Court of Claims to render a judgment that would be conclusive between the parties and which could be reviewed by this court. We must therefore first consider whether that act is liable to the constitutional objection just stated.

The ground of this contention is that having met in regular session at the time appointed by law, the first Monday of December, 1892, and having on the 22d day of that month (two days after the presentation of the bill to the President) by the joint action of the two Houses taken a recess to a named day, January 4, 1893, Congress was not actually sitting when the President on the 28th day of December, 1892, by signing it formally approved the act in question. The proposition, plainly stated, is that a bill passed by Congress and duly presented to the President does not become a law if his approval be given on a day when Congress is in recess. This implies that the constitutional power of the President to approve a bill so as to make it a law is absolutely suspended while Congress is in recess for a fixed time. It would follow from this that if both Houses of Congress by their joint or separate action were in recess from some Friday until the succeeding Monday, the President could not exercise that power on the intervening Saturday. Indeed, according to the argument of counsel the President could not effectively approve a bill on any day when one of the Houses, by its own separate action, was legally in recess for that day in order that necessary repairs be made in the room in which its sessions were being held. Yet many public acts and joint resolutions of great importance together with many private acts have been treated as valid and enforceable which were approved by the President during the recesses of Congress covering the

Christmas holidays. In the margin will be found a reference to some of the more recent of those statutes.[1]

Do the words of the Constitution, reasonably interpreted, sustain the views advanced for appellant?

That instrument provides:

"The Congress shall assemble at least once in every year, and such meeting shall be on the first Monday in December, unless they shall by law appoint a different day." Art. I, § 4.

"Neither House, during the session of Congress, shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two Houses shall be sitting." Art. I, § 5.

"Every bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a law, be presented to the President of the United States; if he approves, he shall sign it, but if not, he shall return it, with his objections, to that House in which it shall have originated, who shall enter the objections at large on the journal, and proceed to reconsider it. If after such reconsideration two thirds of that

---

[1] I. PUBLIC ACTS: 1862, 12 Stat. 632, c. 4; Id. c. 5; Id. c. 6; 1866, 14 Stat. 374, c. 5; 1868, 15 Stat. 266, c. 4; 1869, 16 Stat. 61, c. 4; Id. c. 5; 1872, 17 Stat. 400, c. 12; Id. 401, c. 13; Id. 404, c. 14; Id. c. 15; Id. c. 17; 1873, 18 Stat. 1, c. 3; 1874, 18 Stat. 293, c. 7; Id. c. 8; Id. c. 9; Id. 294, c. 10; 1874, 18 Stat. 294, c. 12; 1875, 19 Stat. 1, c. 1; 1879, 21 Stat. 59, c. 1; Id. c. 2; 1880, 21 Stat. 311, c. 4; Id. 312, c. 5; Id. c. 6; Id. c. 7; Id. c. 8; Id. 313, c. 9; Id. c. 10; 1884, 23 Stat. 280, c. 7; 1886, 24 Stat. 353, c. 9; 1887, 24 Stat. 354, c. 11; Id. c. 12; Id. c. 13; Id. 355, c. 14; Id. 356, c. 15; Id. 358, c. 16; 1888, 25 Stat. 638, c. 7; Id. c. 8; 1889, 25 Stat. 639, c. 18; 1892, 27 Stat. 409, c. 14; Id. 410, c. 15; Id. 412, c. 16; 1894, 28 Stat. 595, c. 8; Id. 596, c. 9; Id. c. 10; Id. c. 11; Id. 597, c. 12; Id. 599, c. 14; Id. c. 15; 1897, 30 Stat. 226, c. 3.

II. JOINT RESOLUTIONS: 1869, 16 Stat. 368, No. 5; Id. No. 6; 1872, 17 Stat. 637, No. 1; 1878, 20 Stat. 487, No. 1; Id. No. 2; Id. No. 3; 1883, 23 Stat. 265, No. 3; 1885, 24 Stat. 339, No. 2; Id. No. 3; 1893, 28 Stat. 577, No. 7; 1894, 28 Stat. 967, No. 2.

III. PRIVATE ACTS: 1873, 18 Stat. 529, c. 2; 1874, 18 Stat. 529, c. 4; 1879, 21 Stat. 531, c. 3; 1880, 21 Stat. 601, c. 11; Id. c. 12; Id. 602, c. 13; Id. c. 14; 1884, 23 Stat. 615, c. 6; 1885, 24 Stat. 653, c. 1; Id. c. 2; 1886, 24 Stat. 881, c. 10; 1887, 24 Stat. 882, c. 17; Id. c. 18; Id. 883, c. 19; Id. 884, c. 20; 1888, 25 Stat. 1251, c. 9; Id. c. 10; Id. 1252, c. 11; Id. c. 12; Id. c. 13; Id. c. 14; Id. c. 15; Id. 1253, c. 16; Id. c. 17; 1894, 28 Stat. 1022, c. 13; Id. c. 16; Id. c. 17.

House shall agree to pass the bill, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a law. But in all such cases the votes of both Houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each House, respectively. If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress, by their adjournment, prevent its return, in which case it shall not be a law." Art. I, § 7.

"Every order, resolution or vote, to which the concurrence of the Senate and House of Representatives may be necessary, (except on a case of adjournment,) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill." Art. I, § 8.

It is said that the approval by the President of a bill passed by Congress is not strictly an executive function, but is legislative in its nature; and this view, it is argued, conclusively shows that his approval can legally occur only on a day when both Houses are actually sitting in the performance of legislative functions. Undoubtedly the President when approving bills passed by Congress may be said to participate in the enactment of laws which the Constitution requires him to execute. But that consideration does not determine the question before us. As the Constitution while authorizing the President to perform certain functions of a limited number that are legislative in their general nature does not restrict the exercise of those functions to the particular days on which the two Houses of Congress are actually sitting in the transaction of public business, the court cannot impose such a restriction upon the Executive. It is made his duty by the Constitution to examine and act upon every bill passed by Congress. The time within which he must approve or dis-

approve a bill is prescribed. If he approve a bill, it is made his duty to sign it. The Constitution is silent as to the time of his signing, except that his approval of a bill duly presented to him — if the bill is to become a law merely by virtue of such approval —must be manifested by his signature within ten days, Sundays excepted, after the bill has been presented to him. It necessarily results that a bill when so signed becomes from that moment a law. But in order that his refusal or failure to act may not defeat the will of the people, as expressed by Congress, if a bill be not approved *and* be not returned to the House in which it originated within that time, it becomes a law in like manner as if it had been signed by him. We perceive nothing in these constitutional provisions making the *approval* of a bill by the President a nullity if such approval occurs while the two Houses of Congress are in recess for a named time. After a bill has been presented to the President, no further action is required by Congress in respect of that bill unless it be disapproved by him and within the time prescribed by the Constitution be returned for reconsideration. It has properly been the practice of the President to inform Congress by message of his approval of bills, so that the fact may be recorded. But the essential thing to be done in order that a bill may become a law by the approval of the President is that it be signed within the prescribed time after being presented to him. That being done, and as soon as done, whether Congress is informed or not by message from the President of the fact of his approval of it, the bill becomes a law, and is delivered to the Secretary of State as required by law.

Much ·of the argument of counsel seems to rest upon the provision in relation to the final adjournment of Congress for the session, whereby the President is prevented from returning, within the period prescribed by the Constitution, a bill that he disapproves and is unwilling to sign. But the Constitution places the approval and disapproval of bills, as to their becoming laws, upon a different basis. If the President does not approve a bill, he is required within a named time to send it back for consideration. But if by its action, after the

presentation of a bill to the President during the time given him by the Constitution for an examination of its provisions and for approving it by his signature, Congress puts it out of his power to return it, not approved, within that time to the House in which it originated, then the bill falls, and does not become a law.

Whether the President can sign a bill after the final adjournment of Congress for the session, is a question not arising in this case, and has not been considered or decided by us. We adjudge — and touching this branch of the case adjudge nothing more — that the act of 1892 having been presented to the President while Congress was sitting and having been signed by him when Congress was in recess for a specified time, but within ten days, Sundays excepted, after it was so presented to him, was effectively approved, and immediately became a law, unless its provisions are repugnant to the Constitution.

II. It is said that the present proceeding based on the act of 1892 is not a " case " within the meaning of that clause of the Constitution declaring that the judicial power of the United States shall extend to all cases in law and equity arising under that instrument, the laws of the United States, or treaties made or which shall be made under their authority. Art. III, § 2.   This Article, as has been adjudged, does not extend the judicial power to every violation of the Constitution that may possibly take place, but only " to a case in law or equity, in which a right, under such law, is asserted in a court of justice.   If the question cannot be brought into a court, then there is no case in law or equity, and no jurisdiction is given by the words of the Article.   But if, in any controversy depending in a court, the cause should depend on the validity of such a law, that would be a case arising under the Constitution to which the judicial power of the United States would extend."   *Cohens* v. *Virginia*, 6 Wheat. 264, 405.   In the same case, Chief Justice Marshall declared a suit to be the prosecution by a party of some claim, demand or request in a court of justice for the purpose of being put in possession of a *right* claimed by him and of which he was deprived.

Referring to the provision defining the judicial power of the United States, the court in a subsequent case said: "This clause enables the judicial department to receive jurisdiction to the full extent of the Constitution, laws and treaties of the United States, when any question respecting them shall receive such a form that the judicial power is capable of acting on it. That power is capable of acting only when a subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the Constitution declares that the judicial power shall extend to all cases arising under the Constitution, laws and treaties of the United States." *Osborn* v. *United States Bank*, 9 Wheat. 738, 819. In *Murray* v. *Hoboken*, 18 How. 272, 284, this court said that Congress can neither " withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination." But in the same case it was observed by Mr. Justice Curtis, speaking for the court, that "there are matters involving public rights which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." Of like import was the judgment in *Smith* v. *Adams*, 130 U. S. 167, 173, in which the court said that the terms " cases" and " controversies" in the Constitution embraced " the claims or contentions of litigants brought before the courts for adjudication by regular proceedings established for the protection or enforcements of rights, or the prevention, redress or punishment of wrongs."

The principles announced in the above cases are illustrated by the opinion prepared by Chief Justice Taney for the case of *Gordon* v. *United States*, 2 Wall. 561, and printed in 117 U. S. 697. That case was brought to this court from the Court of Claims, and related to a demand asserted against the United States. The principal question was whether this court had jurisdiction to review the final order made in the court

below. The Chief Justice died before the case was decided and the opinion prepared by him in recess was not formally accepted. But if the court approved his views, as it undoubtedly did, the appeal was dismissed upon the ground that Congress could not authorize or require this court to express an opinion on a case in which its judicial power could not be exercised, and when its judgment would not be final and conclusive upon the rights of the parties. "The award of execution," Chief Justice Taney said, "is a part, and an essential part, of every judgment passed by a court exercising judicial power. It is no judgment, in the legal sense of the term, without it. Without such an award, the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. It would be merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties, unless Congress should at some future time sanction it, and pass a law authorizing the court to carry its opinion into effect. Such is not the judicial power confided to this court in the exercise of its appellate jurisdiction; yet it is the whole power that the court is allowed to exercise under this act of Congress." In a more recent case this court dismissed an appeal from a final order made in the Court of Claims in virtue of a particular statute, observing: "Such a finding is not made obligatory on the department to which it is reported — certainly not so in terms, and not so, as we think, by any necessary implication. We regard the function of the Court of Claims, in such a case, as ancillary and advisory only. The finding or conclusion reached by that court is not enforceable by any process of execution issuing from the court, nor is it made by the statute the final and indisputable basis of action either by the department or by Congress." *In re Sanborn,* 148 U. S. 222, 226; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 483.

Under the principles established in the cases above cited, the objections urged against the jurisdiction of the Court of Claims and of this court cannot be maintained, if the present proceeding involves a right which in its nature is susceptible of judicial determination, and if the determination of it by

the Court of Claims and by this court is not simply ancillary or advisory but is the final and indisputable basis of action by the parties.

The money in the hands of the Secretary of State was paid to the United States by Mexico pursuant to the award of the Commission. That tribunal dealt only with the two Governments, had no relations with claimants, and could take cognizance only of claims presented by or through the respective governments. No claimant, individual or corporate, was entitled to present any demand or proofs directly to the Commission. No evidence could be considered except such as was furnished by or on behalf of the respective governments. While the claims of individual citizens presented by their respective governments were to be considered by the Commission in determining amounts " the whole purpose of the convention was to ascertain how much was due from one. government to the other on account of the demands of their respective citizens." And " each government, when it entered into the compact under which the awards were made, relied on the honor and good faith of the other for protection so far as possible against frauds and impositions by the individual claimants." *Frelinghuysen* v. *Key,* above cited. As between the United States and Mexico, indeed as between the United States and American claimants, the money received from Mexico under the award of the Commission was in strict law the property of the United States, and no claimant could assert or enforce any interest in it so long as the Government legally withheld it from distribution.

When the La Abra Company asked the intervention of the United States it did so on the condition imposed by the principles of comity recognized by all civilized nations, that it would act in entire good faith, and not put the government whose aid it sought in the attitude of asserting against the Mexican Republic a fraudulent or fictitious claim; consequently the United States, under its duty to that Republic, was required to withhold any sum awarded and paid on account of the Company's claim if it appeared that such claim was of that character. As between the United States and the

Company, the honesty or genuineness of the latter's claim was open to inquiry in some appropriate mode for the purpose of fair dealing with the government against which such claim was made through the United States. We so adjudged in the *Key case.* The United States assumed the responsibility of presenting the La Abra claim and made it its own in seeking redress from the Mexican Republic. But from such action on its part no contract obligations arose with the La Abra Company "to assume their frauds and to collect on their account all that, by their imposition of false testimony, might be given in the awards of the Commission." *Boynton* v. *Blaine,* above cited.

These considerations make it clear that the act of 1892 is not liable to the objection that it subjected to judicial determination a matter committed by the Constitution to the exclusive control of the President. The subject was one in which Congress had an interest, and in respect to which it could give directions by means of a legislative enactment. The question for the determination of which the present suit was directed to be instituted was whether the award made by the Commission in respect to the claim of the La Abra Company was obtained as to the whole sum included therein or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the Company, or its agents, attorneys or assigns. It cannot, we think, be seriously disputed that the question whether fraud has or has not been committed in presenting or prosecuting a demand or claim before a tribunal having authority to allow or disallow it is peculiarly judicial in its nature, and that in ascertaining the facts material in such an inquiry no means are so effectual as those employed by or in a court of justice. The Executive branch of the Government recognized the inadequacy for such an investigation of any means it possessed, and declared that Congress by its "plenary authority" ought not only to decide whether such an investigation should be made, but provide an adequate procedure for its conduct and prescribe the consequences to follow therefrom. The suggestion that the question of fraud be committed to the determination of a judicial

tribunal first came from the Executive branch of the Government. Undoubtedly Congress, having in view the honor of the Government and the relations of this country with Mexico, could have determined the whole question of fraud for itself, and by a statute, approved by the President, or which being disapproved by him was passed by the requisite constitutional vote, have directed the return to Mexico, the other party to the award, of such moneys as had been paid into the hands of the Secretary of State. It is also clear that in the absence of any statute suspending the distribution of such moneys, the President could have ignored the charges of fraud and ordered the distribution to proceed according to the terms of the treaty and the award. But it does not follow that Congress was without power, no distribution having been made, to control the whole matter by plenary legislation.

It has been adjudged that Congress by legislation, and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country which had been negotiated by the President and approved by the Senate. *Head Money cases*, 112 U. S. 580, 599; *Whitney* v. *Robertson*, 124 U. S. 190, 194; *Chinese Exclusion case*, 130 U. S. 581, 600; *Fong Yue Ting* v. *United States*, 149 U. S. 698, 721. It is therefore difficult to perceive any ground upon which to question its power to make the distribution of moneys in the hands of the Secretary of State — representing in that matter the United States and not simply the President — depend upon the result of a suit by which the United States would be bound and in which the claimants to the fund in question could be heard as parties, and which was to be brought in a court of the United States by its authority, for the purpose of determining whether the La Abra Company, its agents or assigns had been guilty of fraud in the matter of the claim that it procured to be presented to the Commission. The act of 1892 is to be taken as a recognition, so far as the United States is concerned, of the legal right of the Company to receive the moneys in question unless it appeared upon judicial investigation that the

United States was entitled, by reason of fraud practised in the interest of that corporation, to withhold such moneys from it. Here then is a matter subjected to judicial investigation in respect of which the parties assert *rights* — the United States insisting upon its right under the principles of international comity to withhold moneys received by it under a treaty on account of a certain claim presented through it before the Commission organized under that treaty in the belief, superinduced by the claimant, that it was an honest demand; the claimant insisting upon its absolute legal right under the treaty and the award of the Commission, independently of any question of fraud, to receive the money and disputing the right of the United States upon any ground to withhold the sum awarded. We entertain no doubt these rights are susceptible of judicial determination, within the meaning of the adjudged cases relating to the judicial power of the courts of the United States as distinguished from the powers committed to the Executive branch of the Government.

It remains, in our consideration of the question of jurisdiction, to inquire whether the judgment authorized by the act of 1892 to be rendered would be a final, conclusive determination, as between the United States and the defendants, of the rights claimed by them respectively, or only ancillary or advisory. In our opinion the act of Congress authorized a final judgment of the former character and therefore the judgment of the Court of Claims is reviewable by this court in the exercise of its appellate judicial power. If our judgment should be one of affirmance then the La Abra Company, and its legal representatives or assigns are barred of all claim, legal or equitable, to the money received by the United States from the Republic of Mexico on account of the award of the Commission. Such a determination would rest upon the broad ground that the United States in its efforts to protect the alleged rights of an American corporation had been the victim of fraud upon the part of that corporation, its agents or assigns, and was in law relieved from any responsibility to that corporation touching the claim in question

or the moneys received on account of it. If, on the other hand, this court should find that the charges of fraud were not sustained or were disproved, and reverse the decree of the Court of Claims, then it would become the absolute legal duty of the Secretary of State to proceed in the distribution of the moneys in his hands according to the terms of the award. It was competent for Congress by statute to impose that duty upon him and he could not refuse to obey the mandate of the law.

Much was said in argument about the interference by the act of 1892 with the discharge by the President of his constitutional functions in connection with matters involved in the relations between this country and the Republic of Mexico. For reasons already given this contention cannot be sustained. It is without support in anything done or said by the eminent jurists who have presided over the Department of State since the controversy arose as to the integrity of the claim made by the La Abra Company. On the contrary, those officers have uniformly insisted that the authority of Congress was plenary to determine whether the award in respect of those claims was procured by fraud practised on the part of that Company and whether in that event the Company should be barred of any claim to the moneys received from the Republic of Mexico. Upon this question the legislative and executive branches of the Government have acted in perfect harmony. The question arises under the Constitution of the United States and a treaty made by the United States with a foreign country, is judicial in its nature, and one to which the judicial power of the United States is expressly extended. Both branches of the Government were concerned in the enactment subjecting that question to judicial determination, and it cannot properly be said that the President by approving the act of 1892 or by recognizing its binding force surrendered any function belonging to him under the supreme law of the land.

It was also said in argument that the act of Congress in some way — not clearly defined by counsel — was inconsistent with the principles underlying international arbitration, a

mode for the settlement of disputes between sovereign States that is now more than ever before approved by civilized nations. We might well doubt the soundness of any conclusion that could be regarded as weakening or tending to weaken the force that should be attached to the finality of an award made by an international tribunal of arbitration. So far from the act of Congress having any result of that character, the effect of such legislation is to strengthen the principle that an award by a tribunal acting under the joint authority of two countries is conclusive between the governments concerned and must be executed in good faith unless there be ground to impeach the integrity of the tribunal itself. The act of 1892 is a recognition of the principle that "international arbitration must always proceed on the highest principles of national honor and integrity." *Frelinghuysen* v. *Key*, above cited. By that act the United States declares that its citizens shall not through its agency reap the fruits of a fraudulent demand which they had induced it to assert against another country. Such legislation is an assurance in the most solemn and binding form that the Government of this country will exert all the power it possesses to enforce good faith upon the part of citizens who, alleging that they have been wronged by the authorities of another country, seek the intervention of their Government to obtain redress.

We hold that the act of 1892 is not unconstitutional upon any of the grounds adverted to; that the Court of Claims had jurisdiction to render the decree in question; that such decree, unless reversed, is binding upon the parties to this cause; and that this court, in the exercise of its appellate power, has authority to reëxamine that decree and make such order or give such direction as may be consistent with law.

III. The Court of Claims did not make a finding of facts. It is therefore contended on behalf of the United States that the appeal provided for by the act of 1892 does not authorize a reëxamination of the evidence, as in equity cases generally; and that the present case comes within the rule prescribed by this court under the authority of the act of March 3, 1863, 12 Stat. 766, c. 92; Rev. Stat. § 708, providing that in connec-

tion with any final judgment rendered in the Court of Claims there shall be a finding of facts.

In its opinion on the demurrer to the bill the Court of Claims said: "The directions of the statute [the act of 1892] as to the character of the decree seem to be without doubt, and as the court in the trial of the cause is in the exercise of equity powers, it would find no difficulty in entering such a decree as will carry out the purpose of the statute." 29 C. Cl. 432, 522. In its opinion on the final hearing of the case the court below said: "This being a proceeding in equity, this court is not called upon to settle the facts by the finding of ultimate facts for the consideration of the Supreme Court, but the whole record is transmitted to that court, and the case is to be determined in the Supreme Court upon the law as it shall be adjudged and upon the facts as they shall be found by the decision of the Supreme Court. That would be so in a case of this kind arising under the ordinary jurisdiction of the Court of Claims, but it is especially true from the provisions of the statute giving us the special jurisdiction to determine the issues of this proceeding. The statute provides for a decree, and not for a money judgment." After citing *Harvey* v. *United States*, 105 U. S. 671, the court continued: "All the testimony being before the Supreme Court for the purpose of settling ultimate facts from such testimony, we have confined the limits of this opinion to questions of law, and the determination of the ultimate fact which is, whether the Company was compelled to abandon its mines because of the acts of the people of Mexico and the Mexican authorities." 32 C. Cl. 462, 515, 516.

In our judgment the Court of Claims properly interpreted the act of 1892. While that act does not, in express words, direct the Attorney General to institute a suit "in equity" or declare that this court on appeal should reëxamine the entire case on both law and facts, a suit of that character was contemplated when Congress invested the Court of Claims with full jurisdiction to make "all interlocutory and final decrees therein as the evidence may warrant, according to the principles of equity and justice, and to enforce the same by injunc-

tion or any proper final process," and gave either party the right to appeal to this court from the final decision within ninety days "from the rendition of such final decree." This construction is not inconsistent with the direction that the Court of Claims should in all respects proceed in the suit brought by the Attorney General "according to law and the rules of said court, so far as the same are applicable," and that the appeal from its final decree should be taken "under the rules of practice which govern appeals from said court." Looking at the words of the act of 1892 and the peculiar nature of the important questions involved in any suit brought under it, we cannot suppose that Congress intended to relieve this court from the responsibility of determining for itself and upon its own view of all the evidence what were the ultimate facts bearing upon the inquiry as to the alleged fraud in bringing about the award in question. The present proceeding, we think, comes within the principle announced in *Harvey* v. *United States*, 105 U. S. 671, 691, where it was said that the rule in regard to findings of fact in the Court of Claims had no reference to a case "of equity jurisdiction conferred in a special case by a special act" in which "this court must review the facts and the law as in other cases in equity appealed from other courts." This principle was approved and applied in *United States* v. *Old Settlers*, 148 U. S. 427, 428, 465.

We are of opinion that the appeal provided for in the act of 1892 was one under which it is our duty to determine the rights of the parties as in a case in equity. The provision in the act expressly empowering the court below in the event it was found that the award in question was fraudulently obtained as to the whole or any part of the sum included therein by the La Abra Company, to bar and *foreclose* all claims in law or *equity* on its part, together with the provision authorizing the court to render such *interlocutory* and *final decrees* as the evidence may warrant, according to the principles of equity and justice, and to enforce the same by *injunction*, imports such jurisdiction in the Court of Claims as may be ordinarily exercised by courts of equity as distinguished from courts of law,

and as entitled that court to send up the entire evidence for examination here.

IV. We come now to consider in the light of all the evidence whether the award in question was obtained by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the La Abra Company, its agents, attorneys or assigns.

In view of the exceptional character of the case, and that there may be no ground to misapprehend the basis upon which our decree will rest, we deem it appropriate to set forth in this opinion the principal facts bearing on the issue of fraud.

In its memorial presented to the Commission through the United States, the La Abra Company referred to the mines in Mexico of which it asserted ownership as being of extraordinary richness and historical interest.

It was stated in the memorial that after becoming the proprietor of those mines the Company with all possible dispatch proceeded to the working of them, and to that end sent intelligent agents to Mexico, employed miners, machinists and laborers, purchased mules, equipments, provisions, the best and most improved machinery which were transported on the backs of mules to the mines at heavy cost, and incurred other expenses necessary to the most extensive and successful working of the property; that they expended in the purchase of the mines and in their working the sum of three hundred and three thousand dollars, and as the result of this large expenditure were getting out a large amount of the richest ore and were in the act of realizing the extraordinary profit of a million dollars per annum when, by reason of unfriendly and illegal acts of the Mexican officials, they were compelled to abandon their mines, all their machinery and other property and over a thousand tons of ore obtained by the Company from the mines; that intense prejudice was constantly manifested by the civil and military authorities and by the Mexican populace against all Americans, and especially against those engaged in mining, this prejudice being intensified by the belief that the United States intended to annex Durango, Sinaloa and other States to its territory, and that the La

Abra Company was assisting in that purpose; that the property of the Company and the persons and the lives of employés were threatened by the authorities and the people, and its superintendent was arrested without having given cause for offence, and fined and imprisoned without trial and without being informed of any offence; that when he applied to the authorities civil and military in Durango and Sinaloa for protection, his request was harshly refused, and acts of violence, encouraged by the authorities, were committed against the property and employés of the Company, which so alarmed the employés that it was impossible to keep them at work; that the authorities repeatedly seized its mule trains loaded with provisions and appropriated the same to their use, and large quantities of ore from the mines were taken from the Company, its employés being deterred by threats from resisting such spoliation; that things finally got to such a pass that an employé of the Company in charge of one of its trains was killed by the Liberal forces and the train seized, and that was made matter of boast by the Mexican officials, and the authorities at San Dimas openly avowed their purpose to drive out all American mining companies and get their property; that the one motive of this persecution was to compel the Company to leave, and thus permit the Mexicans to obtain possession of their valuable property; and that from such persecution, outrages and insecurity it became impossible for the Company to work the mines and they were abandoned as stated, such enforced abandonment utterly ruining the Company.

The memorial concluded by alleging that when the Company acquired the La Abra mines, though they were of immense richness, it was impossible from their neglected state to extract ores except by heavy expenditures; that in connection with the principal mines were buildings of great cost and other permanent structures, but owing to the abandoned condition of the mines they were of no present value; that the large expenditures made by the Company at the mines gave a very great value to them and to the buildings and other permanent structures, and they became and were of the value of

$1,000,000; that the Company was obliged to abandon one thousand tons of silver ore already extracted, worth $500,000, which it was impossible for them to bring away, and which upon the abandonment of the mines were carried off by the Mexicans and lost to the Company; that when such abandonment occurred the Company was extracting large quantities of ore, and the profits would have been great if it had been permitted to work them; that the Company estimated its clear annual profits which it could have obtained from the mines at $1,000,000 per annum; that in addition to the expenditures in the mines as aforesaid, the Company had expended $30,000 in conducting its business; and that the mines and the improvements and machinery therein had become wholly lost to the Company, and its losses and damages because of the enforced abandonment were $3,000,030.

The memorial also stated that the Company had never received any indemnity for its claim, and its prayer was for an award against the Mexican Government for its damages with interest thereon.

It may be here observed that this memorial contained no hint or intimation that the abandonment by the Company of mining operations in Mexico was due in any degree to its inability or failure to supply the money necessary for the development of its property and to meet the expenses of mining operations.

That the La Abra Company ceased to work its mines in Mexico and practically abandoned them is undoubtedly true. But is it true that they did so in consequence of violence and outrages committed against it by the public authorities of the Republic of Mexico? The United States insists upon a negative answer to this question. It contends that the Company ceased to work its mines and abandoned its property for reasons wholly disconnected from anything done or omitted to be done by the authorities of Mexico and asserts that the La Abra Company suspended operations in that country not only because of want of funds necessary to develop its property, but because of the belief of stockholders that the mines were not of sufficient value to justify a larger expenditure of money;

and that it was a pure afterthought to attempt by the agency of the United States to fasten upon Mexico responsibility for the losses incurred by the Company in the abandonment of its mining property.

The connection of the La Abra Company with these mines may be briefly stated as follows: In 1865 one Hardy went to the city of New York for the purpose of selling mining property in Mexico which he claimed to own or control and which constitutes part of the property now in question. He there met a person named Garth and exhibited to him some specimens of ore which he stated were taken from that property. Among those whose attention had been called to those mines — precisely at what time or in what way does not appear — was a person named Bartholow. Garth and Bartholow were sent to Mexico by New York capitalists to examine the mines. They were accompanied by Hardy and were joined by one who was reputed to be a California mining expert, named Griffith. The party arrived at the mines near Tayoltita, Mexico, in June, 1865. In his deposition taken June 22, 1874, Bartholow stated that after examining the property several mines with their improvements were purchased from the owners, Don Juan Castillo de Valle and Ygnacio Manjarrez, at the price of $57,000, gold coin. Twenty-two twenty-fourths of the La Abra mine, lying immediately contiguous to the mines purchased from de Valle and Manjarrez, were purchased from Hardy and one Luce, at the price of $22,000, gold coin. In the same deposition Bartholow stated: "We then reported said purchases, and all the facts exactly as they existed there, to said gentlemen, capitalists, all of whom were intimate acquaintances, and some of them personal friends and relatives of said Garth and myself, and thereupon they formed said Abra Silver Mining Company, and organized the same under the general mining laws of the State of New York, to work said mines in Mexico, which organization was perfected on the eighteenth day of November, 1865, and said mines and haciendas were duly conveyed to said company by said Garth and myself, we being amongst the very largest stockholders of the same. . . . After receiving the legal titles to all of

said property, as we did, without any reserved interest to said former owners, the said Garth immediately returned to New York, and I proceeded to the city of San Francisco, California, and I there purchased, for and in the name of said Company, as the same had been determined upon by said Garth and myself, a ten-stamp mill, and other machinery and modern appliances for running or working the same at said mines; and I also purchased provisions and supplies of every kind and description, needed by the officers and employés, which could not be purchased to advantage in Mexico, and I shipped the same to the port of Mazatlan, Sinaloa, by steamships and sailing vessels, and from there said machinery and supplies were transported by mule trains, over the mountains of Sinaloa and Durango, to the said hacienda of La Abra Company, San Nicolas, near to Tayoltita, and I commenced, as superintendent, the work of erecting a mill house for said stamp mill, a new hacienda adjoining the old hacienda, San Nicolas, outhouses for officers and employés, and the opening of said mines, with general preparations for carrying on said mining enterprise on a large scale, as was anticipated by said stockholders.  In the meantime the said Garth and myself had reported to said stockholders, at New York, our entire action and conduct in the matter of said purchases and preparations, which reports were accepted and fully approved by said stockholders, who, upon the organization of said Company, appointed me as the first superintendent of their said mining operations, and requested me to remain as such superintendent until said works were fairly started, and in successful operation.  I had already requested said stockholders, and subsequently the Company, after its organization, to appoint a superintendent to relieve me, as my business in St. Louis was of greater importance to me than my interest in the mining enterprise.  My successor was appointed, and relieved me at said mines in the month of May, 1866."

The successor of Bartholow as superintendent in charge of the mining property was Colonel Julian A. De Lagnel, formerly an officer in the Army of the United States.  He had had no experience in mining, but was recognized by all —

and properly, according to the evidence in this record — as a gentleman of integrity and force of character. He left New York for the mines in March, 1866, and arrived there in April of that year. He discharged the duties of superintendent for about one year and until the spring of 1867 and was succeeded by a person named Exall. The latter remained in charge of the mines until about March or April, 1868, when he abandoned the property and returned to New York, and all work at the mines ceased. When Exall left Mexico for New York, the property was placed by him in charge of one Granger. The principal witnesses before the Commission on behalf of the La Abra Company were Bartholow and Exall. The Company did not take the testimony of De Lagnel, giving as a reason for not doing so the impossibility of ascertaining his whereabouts. That excuse is not sustained by the record before us.

During the entire period when Bartholow, De Lagnel and Exall were respectively superintendents at the mines, Garth was the executive officer and manager of the affairs of the Company at the city of New York, representing it in all correspondence with the different superintendents. Whatever omissions of duty were fairly chargeable against the Mexican authorities in respect of the Company's property necessarily occurred after Bartholow took charge at the mines and before Exall returned to New York. During that period of about three years there was a regular correspondence by letter between the respective superintendents and Garth in his capacity as representative of the Company at its chief office in New York. Neither the Commissioners nor the Umpire had those letters before them when the La Abra claim was examined by them. After the award in question, the letter-impression book in which the letters or reports of the superintendents were originally copied was discovered by Mexico and brought by its diplomatic representatives to the attention of the Department of State. Of the identity of that book, as containing the correspondence between the La Abra Silver Mining Company and its several Superintendents at the mines, no doubt can exist although it is insisted that some letters do

not now appear in the book that were once in it. It was, we suppose, principally the evidence furnished by that correspondence that induced Secretary Evarts to report to the President that the honor of the United States required that the La Abra claim should be further investigated in order to ascertain whether its Government had not been induced to enforce against a friendly power claims of American citizens based upon or exaggerated by fraud and false swearing.

That there was before the Commission some evidence which, uncontradicted or unexplained, tended to support the allegations of outrage, violence and neglect of duty on the part of Mexican authorities may be admitted. That evidence came largely from Bartholow and Exall. But it is manifest that the Umpire could not possibly have reached the conclusion he did in respect to the La Abra claim if the letter book, giving detailed accounts from time to time of all that occurred at the mines while in charge of Bartholow, De Lagnel and Exall, had been in evidence when he rendered his decision. The reports made by the Company's superintendents as to the management of the property and of what occurred at the mines are utterly inconsistent with the statement that the Company's abandonment of mining operations and of its property was in consequence of the misconduct and violence of the Mexican authorities. Placing this letter book beside the evidence adduced before the Commission and the Umpire by the La Abra Company, it is clear that the material transactions and incidents which the Company's witnesses before the Commission detailed as establishing the charge against the Mexican authorities were misstated or grossly exaggerated. It now appears that much of the evidence upon which the Commission must have rested its conclusion was wholly without foundation and had its origin in a fraudulent purpose or plan to make it appear that the public authorities of Mexico were chargeable with a responsibility that could not fairly or justly be imputed to them.

Let us see how far this general statement is justified by the evidence adduced in the present case when examined in connection with the testimony brought before the Commission.

In the memorial presented by the Company through the United States the principal specification of the outrages alleged to have been committed by the Mexican authorities was that "one of the personnel of the Company, in charge of one of its trains, was openly killed by the Liberal forces, and the train seized, and that was made matter of boast by the Mexican officials, and the authorities at San Dimas openly avowed their purpose to drive out all American mining companies and get their property." The particular matter here referred to was that of the killing during the superintendency of Bartholow of William Grove, an employé of the Company. We have already referred to the deposition of Bartholow taken June 22, 1874. It seems that prior to that date the Mexican Government had taken the deposition or affidavit of Pio Quinto Nunez and Cepomuceno Manjarrez. Nunez, who resided in the district where the mines were situated, among other things testified "that it is not true that these Americans abandoned their enterprise on account of the acts of Mexican officials, and that it is equally false that either the civil or military authorities, or the inhabitants of the district, made any prejudicial opposition to them, as they have alleged they did; that the deponent has never seen or heard it said that any superintendent was imprisoned, and much less does he believe that such superintendent complained to the civil or military authorities in Durango and Sinaloa, and was denied the protection thus solicited; that he has never known that the authorities have countenanced acts of violence against the interests and employés of the Company; that it is false that the authorities, as the Company allege, took possession of their mules and provisions, and appropriated the same to their own use; that the Company never had any ore taken from them, as they affirm, since that which they took out of their mines still exists, as before stated; nor have their employés ever been threatened by any Mexican with intention to rob them; that the Company has no reason to complain, in any way, against Mexico, because they did not abandon their operations on account of the Mexicans, but because they themselves did not understand how to carry on the work-

ing of the mines, as is proven by the unproductive manner in which they worked; that this is the cause of their abandonment, and not, as they say, from any want of security; that the reparation, which the Company claims of Mexico, is not founded in justice, because the allegations upon which it is based are false." Manjarrez, residing in the same district, testified to the same effect.

Now, when Bartholow's deposition was taken in 1874 he was asked whether the statements made by Nunez and Manjarrez and other witnesses for Mexico were true. He answered in the negative, saying they were wholly untrue. In response to an inquiry as to the circumstances of the murder of one of the employés of the Company in charge of mule trains or supplies, he then testified : " His name was William Grove; he was one of my most valued employés; he was murdered between the town of San Ignacio and Tayoltita; I afterwards recovered his body; it was badly mutilated by gunshot wounds, evidently produced by a volley of musketry. This occurred in January or February, 1866. At the time of the murder Mr. Grove was in the employ of the Abra Company as quartermaster, and was intrusted with the charge of one of our mule trains, used for transportation of supplies. Mr. Grove was murdered by soldiers of the Republican army. The train that was the special charge of Mr. Grove was taken possession of by the military authorities, with its entire outfit and supplies, all of which were totally lost to the Abra Company. The mule trains owned and worked by the Company, at that time, were three in number, aggregating about one hundred and fifty mules; the train so taken was one of the three here mentioned."

This was a very imposing statement in support of the charge in the Company's memorial as to the murder of one of its employés and the seizure of its property by the Mexican authorities. But the charge had no foundation in fact, if Bartholow's account of the affair as contained in his report made to the Company when all the circumstances were fresh in his mind was true. In his report to Garth as the representative of the La Abra Company, of March 7, 1866, — which

report appears in the letter book above referred to, — he said : "In my last letter I informed you that one of my employés, Wm. Grove, Esq., formerly of Saline Co., Mo., was missing, and I feared had been waylaid and murdered; since then my worst fears have been realized, for after a search of two weeks his body was found buried in the sand on the bank of the Piastla River, some ten miles above the mouth of Candalaro Creek, near where he had been murdered. At the time of the discovery of the body it was in such an advanced state of decomposition that it was impossible to ascertain the manner in which he had been killed. His mule, pistol and clothing have not yet been found; the mule is, however, likely to turn up, as it had our hacienda brand ' U. S. ' on the left shoulder. These facts were promptly laid before the commander of the Liberal troops at San Ignacio, Senor D. Jesus Vega, who took great interest in the matter and promised to use all the means in his power to discover the murderers and bring them to justice, and he has had arrested and placed in confinement two men charged with the crime, and his soldiers are in pursuit of the third. These we are assured will be tried by court martial, and if found guilty will be summarily executed. Mr. Grove, I think, lost his life by imprudence in talking; he had resided in Mexico for six or seven years, spoke the language quite fluently, and ought to have understood the character of the people. I had nominally purchased a train of pack mules in Mr. Grove's name and sent him to San Ignacio to obtain a permit for them to pack for me, and a guarantee that they would not be taken by the army; he succeeded in getting these documents and was on his way home to take possession of the mules and start them to packing; he passed the night previous to his death at the house of one Meliton, at Techamate, the place where you will recollect we stopped for dinner on our first trip up, where we had quite a quantity of watermelons. This man Meliton had a bad reputation, was some years ago convicted of murder and robbery and sentenced to be executed, but got clear by bribery. Grove told this man of his purchase of the pack train, and that he was to

pay $4000 for it, and was on his way to take possession of it and start it to work, thus leaving the impression that he had this sum of money with him. Now, whilst I do not think that Meliton committed the murder, I have no doubt of his having planned it and arranged for it to be done, and the imprudence of Mr. G. in telling this man the circumstances above mentioned, in my opinion, was the cause which led to his murder, which was effected between Techamate and Tenchuguilita, about midway between the two places." In a subsequent report to Garth under date of April 10, 1866, he said: "I wrote you fully in my last letter detailing the circumstances of the murder of William Grove and the finding of his body. Since then the Liberal authorities have taken the matter in hand and arrested one of the murderers at this place. The villain was actually *in our employ*, doubtless for the purpose of ascertaining when an opportunity should offer to waylay and murder another of our men if the prospect for plunder was sufficient to warrant the risk. When the officers arrested him I had him conveyed to the blacksmith shop and securely ironed. The next day he was conveyed to San Ignacio and thence to Cosala, where he was tried. We failed to convict him for the murder of Grove, but he was convicted for the murder of a woman, whom he killed previously, and sentenced to be shot, and before the execution of the sentence he confessed the murder of Grove, and revealed the names of his two confederates; these two would have been arrested before this but for the expulsion of the Liberals from the country. Now we will have to wait for the Imperialists to put their officers in power before we can act any further in the matter."

These letters were not before the Commission. If they had been, that body could not have attached any importance whatever to the statement in Bartholow's deposition of 1874 to the effect that the murder of Grove was committed by soldiers of the Republican Army, or to the charge in the Company's memorial that such murder "was made matter of boast by Mexican officials."

Another of the outrages alleged to have been committed

by the Mexican authorities and to have resulted in driving the La Abra Company from its property was described in the original evidence as the robbery of Scott, one of its employés. That evidence indicated that the robbery was by the military authorities then in control in the locality of the mines. Referring to "the military authorities of the Republic" under the command of General Corona, Bartholow stated in his deposition of 1874: "One of the employés of the Company, who had been sent to Mazatlan on business, was robbed by said military authorities, near Camacho, in Sinaloa, while on his return from Mazatlan to the Company's works, of eleven hundred and seventy-eight dollars of the moneys of the Company, which amount never was repaid to the Company, nor was the Company ever indemnified for the same in any way. I recollect the exact amount taken, because I entered the same on the books of the Company, charging the same to the 'robbery account,' where other 'prestamos' and robberies were entered. The name of this employé who was so robbed of the Company's money was George Scott, commonly called 'Scottie.' This transaction was nothing less than highway robbery by said troops, and was in addition to the several 'prestamos' levied and enforced by the military authorities, which, I have said, ranged from three to six hundred dollars. The amount of cash 'prestamos,' so levied and enforced during my said superintendence, amounted to a little more than three thousand dollars, but the value of the mule trains and supplies so taken from the Company by the said military, while I was superintendent, was not less than twenty-five thousand dollars."

The same incident was described in an affidavit made in 1870 by a witness for the Company named Clark, who was a contractor for the Company while Bartholow was in charge of its property. He said that he knew "of other abuses of said Company by the military authorities aforesaid; that in the early part of 1866 an employé of said Company, whose name, deponent believes, was George Scott, (called 'Scottie,') who was on his way from Mazatlan to the works of the Company in Durango, was met in the road by an armed party of

the said military between Mazatlan and deponent's residence in Camacho, and said armed party of troops, of the Republican army of Mexico, did, by force of arms, take from said Scott, or 'Scottie,' about twelve hundred out of three thousand dollars in gold coin, ($3000,) Mexican ounces, $187\frac{1}{2}$ ounces, which money belonged to said 'La Abra Silver Mining Company,' and was being transported to said Company by the said 'Scottie,' who appealed to deponent to visit, with him, the headquarters of the army in that district, and to ask General Guerra to return said money, or to receipt for it, in order that he might have *something* to return to said company; that deponent did so visit General Guerra's headquarters with the said 'Scottie,' but was informed by the commanding officer that he could not give up said money. After said Scottie had wasted two or three days to obtain some kind of acknowledgment of the taking of said money, he became disgusted, and returned to report the facts to his Company at Tayoltita."

How differently this affair was regarded at the time by Bartholow is shown by his report to Garth, to be found in the letter book, under date of April 10, 1866. In that report Bartholow spoke of the difficulties he had met and overcome, and stated that a demand for taxes amounting to three or four thousand dollars had been easily met, after corresponding with the collector of taxes, by the payment of thirty dollars, and that there was no necessity of troubling General Corona with the matter. He proceeded : " In consequence of the unsettled state of the country and the presence of bands of robbers on and near the roads leading from here to the port, I have had a great deal of trouble to get money from time to time transported to pay my hands and other expenses, and in consequence I was, of course, unwilling to risk any very large sum at one time : yet, when we were getting timber and doing other work which required a great many Mexican laborers, we frequently needed $1000 per week, and of course all that the proceeds of the sales of goods did not supply had to be brought from Mazatlan, but I so managed it that we never had more than from $1500 to $2000 at risk at one time, and all came through safe except in one case. This

occurred some two weeks ago, when I sent Mr. Scott to San Ignacio to settle our taxes with the authorities. I gave him a check on Messrs. Echeguran, Quintana & Co., for $1000 to bring up. Besides this he had some money outside of this sum which was left after paying the taxes in San Ignacio. He got the money as directed and started out of Mazatlan to overtake a train which was bringing up some supplies for us and Mr. Rice, and when about twenty miles out from the port, near the town of Comacho, six or eight armed men sprang into the road and with their guns levelled upon him forced him to dismount, and robbed him of $1178 in money, his pantaloons and boots (the latter, however, being No. 12, were too large for any of the villains, and were returned). He immediately informed the nearest commander of the Liberal forces of the fact, who sent for him for the purpose of identifying the robbers. He complied, but could not find them, for the reason that the officer could not find even half his men. I also at the same time opened a correspondence with General Corona through the prefect, Colonel Jesus Vega, at San Ignacio, who by the way is, I think, one of the most perfect gentleman I have met in the country, and I am of the opinion that but for the turn in military affairs which occurred a few days since, we would in some way or other have been reimbursed for the loss, but now I have no hopes whatever, and we may as well charge up $1178 to profit and loss."

Can the statements in that report be reconciled with the declaration in the affidavit of Clark and in the deposition of Bartholow that the robbery of Scott was by the military authorities of the Republic under General Corona? We think not. The affair as described in that letter could never have been made the basis of a finding that would place the responsibility for this robbery upon the public authorities then holding control in Mexico.

We now refer to a matter occurring during the superintendency of De Lagnel. It was referred to in argument as the Valdespino forced loan. Alluding to this exaction in his deposition, taken in rebuttal while the case was being prepared for the Commission, and being asked whether it was paid by

him, and if not by whom, Exall said : " It is untrue that any part of it was paid by me, voluntarily or otherwise. I was not superintendent until September, 1866, and this loan was made in July, 1866, when Colonel De Lagnel was superinten- dent, as will be seen by the order addressed by said Valdespino to Colonel De Lagnel, and to the best of my recollection, the whole amount, $1200, was required of and paid by said De Lagnel." Granger, in whose charge the property was left by Exall in the spring of 1868, made an affidavit in 1870 which the Company used before the Commission in support of the charge that the Mexican authorities had imposed upon it forced loans or prestamos. He said : " Said Company was also forced to pay ' prestamos.' A letter was received by Colonel De Lagnel, superintendent of said Company, from Colonel Valdespino, of the Republican army of Mexico, dated July 27, 1866, and signed ' Jesus Valdespino,' which came into my possession as clerk of the Company, and which letter has never, since its receipt, passed out of my possession ; and I now present the same to the consul, marked ' Exhibit Z.' This letter demands twelve hundred dollars ($1200) from said Company for the support of his· forces, under his command. It is needless to say the demand was complied with."

Here we have a distinct assertion by the Company, through its witnesses, that this demand to pay $1200 was met by the Company. The fact was just the reverse, as must have been known to some of the representatives of· the Company who were .accredited by it to the Commission as witnesses having knowledge of the facts. On the day succeeding the receipt of Valdespino's letter Colonel De Lagnel wrote to the Gefe Politico of the San Dimas mines as follows : " In due time reached me your communication of yesterday in regard to a loan or tax which you exact from the residents of the district for the support of the forces of Colonel Valdespino, and hav- ing noticed the contents thereof I answer it forthwith. I send you part of the articles I have and which you ask me for, hoping that they be useful and acceptable to you. As regards the cash I am sorry to inform you that it is impossible· for me to send you even a little, because I have not here the

necessary amount to defray my many and constant expenses. I request you to consider that this hacienda has brought the country thousands and thousands of dollars, most of which have been spent among the needy people of this district, and a considerable part in duties paid into the treasury of the district, under whose flag Colonel Valdespino is serving. As it .is public and well known, not a single dollar have we received of this sum up to date. I send you two pieces of blue mohair and two pieces of bleached cotton, valued at sixty-five dollars and seventy-five cents, of which amount be pleased to send me the corresponding receipt, in order that it may serve me as a voucher to the Company I have the honor to represent." At the same time De Lagnel wrote to Colonel Valdespino : " Your favor of yesterday informs me of the sad situation in which you find yourself for the lack of resources and of your intention to procure them preparatory to leaving the district. Understanding the great need that you are in and considering, as you yourself state, the many evils that we would suffer if you should bring your forces here, I do all I can to overcome the difficulties, and I have sent to the political chief of the district two pieces of mohair and two of bleached cotton, those being the only things among the necessary things mentioned which I have. It is impossible for me to contribute with money in order to provide you with what you need to-day. Be pleased to consider that our reducing works are not complete, and therefore unproductive, without reckoning the many expenses that we yet have to make, the proximity of the rainy season, the scarcity of money, and the abnormal political situation, which cannot but cause us serious damages. I am not, therefore, in a condition to accede, as you desire, to the wishes of the political chief, but have sent him what I have, hoping that they be accepted as a token of my good will. I suppose that having contributed with what I can I may, as a matter of course, resume my work without fearing the interruption that would be caused by the arrival of armed forces." But this is not all the evidence on this point. De Lagnel, under date of July 31, 1866, wrote to Rice, the superintendent of the Company at San Dimas, saying : " As to the

forced, voluntary (?) loan, it was an impossibility to meet the demand, and I so stated in my note to the prefect."

If any additional evidence were needed to disprove the statement before the Commission that the Company by its agent had met and paid the levy of $1200 by Valdespino to be used in supporting his troops, it is found in De Lagnel's deposition taken in this cause. His attention being called to the reference in the letter book to this levy or forced loan, he said : " I received from the civil officer in San Dimas, and also at the same time from Colonel Valdespino, letters, both bearing on the same subject. He had come into the vicinity with a command of cavalry — Liberal cavalry — destitute. The mules were broken down by coming over the mountains. They wanted food and clothing and money, and they wrote to me, saying that they had apportioned it on the two mining companies, the one at San Dimas and the one with which I was connected, levying one quarter upon us, and the other half was to be borne by the citizens. I was advised to comply. They wanted $300, if I recollect right, in money. I didn't have the money to give them, and didn't intend to give it even if I had it. . . . I sent them a few goods — some stuff they wanted, blankets, and hats. I sent them some goods, cotton goods, and wrote a courteous note to each one of them, expressing regret that I could not comply with their wishes, and stating that we had no money, because the mines had never turned out a dollar. They wrote me an acknowledgment and sent a receipt for the goods and courteous acknowledgments. That was the end of it."

There are many other specific matters discussed in the elaborate briefs of counsel. To consider each of them and show the grounds upon which our conclusions rest would extend this opinion far beyond all proper limits. There were undoubtedly some unpleasant occurrences, such as the affair between Exall and Perez, a local judge, growing out of a misunderstanding by the latter of Exall's order to him to keep out of a particular room at the mines. But none of those occurrences had any real connection with the abandonment by the Company of its mining property in Mexico ; and as is

evident from the new proof adduced in this cause, they were described by the Company and its witnesses in the testimony before the Commissioners in such exaggerated terms as to justify the charge of fraud made in the bill filed by the Government.

What does the letter-impression book disclose as the real cause of the Company's abandonment of its mines?

In the reports made by Bartholow, the first superintendent, to Garth of February 6, March 7 and April 10, 1866, no statement is made which even by inference showed that any difficulties were in his way that had their origin in the acts or conduct of the public civil or military authorities of Mexico. On the contrary, one letter shows that he obtained military protection for the mill transported from Mazatlan to the mines, and another one that he had pleasant relations with the civil and military authorities of the locality.

Looking next at the reports of De Lagnel, the second superintendent, we find a letter of July 6, 1866, from him to Garth, showing that there was then a heavy outstanding indebtedness against the Company that compelled the superintendent not only to lessen expenditures, but to reduce the working force nearly one half, and pay the workmen for their services one half in cash and one half in goods. Under date of October 8, 1866, De Lagnel wrote: "I am troubled exceedingly that better success has not attended my efforts, but the rainy season has proven a sore trial to my patience and been a serious drawback. I have striven to meet your wishes and expectations, and regret that my success has not been commensurate with my efforts to serve you and discharge my duties. As to sending a successor, I deem it best to tell you now that no money could tempt me to remain in this country longer than next 1st March." On the 17th of November, 1866, De Lagnel wrote from Mazatlan to Garth: "Had nothing occurred to interrupt the work, I feel sure that at this time the mill would be in operation, and the proofs at last being developed. Unfortunately, I was unable in September or October to communicate with this place; and the ready money giving out at the hacienda, the workmen (not miners)

refused to continue and left, thus bringing the ditch-work to a standstill. . . . In the utter impossibility of obtaining aid here, I have, despite the tone of your letters, drawn upon you for the sum of seven thousand dollars. I feel sure that you will experience no greater feeling of annoyance in receiving the intelligence than I do in communicating the fact; but after debating the thing long and carefully, I am satisfied that it is the best course to pursue. Longer delay in executing the work would be most injurious, perhaps fatal. . . . At present the mine is, I may say, *bare of metal.* A few days before I left metal had been struck again, but in so small a quantity as to forbid much hope."

Under date of January 5, 1867, De Lagnel wrote again to Garth from Mazatlan: "In your latest letter, the 20 Nov'r, you there informed me that you can meet no further drafts upon you; yet I had already, about the 17 Nov'r, drawn on you as treasurer for the sum of seven thousand dollars. I wrote to you fully by the same mail, and hoped to be able to send the letter. via Acapulco, and thus reach you before the draft. In this I was disappointed, and my letters having gone via S. Francisco will reach you at the same time that the d'ft comes in for payment. I trust that, despite what you say, you will find some way to satisfy the draft, for if it goes to protest it will be of incalculable injury to the best interests of the Co. To me the consequences of such a thing would be both mortifying and most embarrassing, but to the Comp'y's interest they would prove far more serious. It is therefore that I urge upon your serious consideration the interest at stake, and pray that a prompt settlement be given upon presentation."

De Lagnel was again in Mazatlan on February 5, 1867, and on that day wrote to Garth, saying: "I had hoped, and fully expected, to be able by this time to send forward some return for the outlay incurred by the Company in the prosecution of its enterprise; but am disappointed in not yet having succeeded in bringing on the water in sufficient quantity to drive all the machinery. . . . The supplies laid in during the past year being in great part exhausted, and a new supply

being absolutely necessary to keep the mines, etc., going, and there being necessity for ready money in order to purchase the requisite supplies, I have drawn upon you for seven thousand five hundred dollars in favor of the Bank of California. This I would not have done had it been possible to do otherwise; but no assistance can be had in this country. I have satisfied myself on this point, and had only the alternative to stop operations or draw on you."

We come now to the period during which Exall was superintendent. His reports to Garth, as the representative of the Company, and Garth's letters to him, make it clear that its bankruptcy was all the time imminent, and that the time was near at hand when all work at the mines would be suspended, not because any obstacles were put in the way of the Company by the Mexican authorities, but solely because it was without money to employ in developing the property.

The first letter written by Exall shows that the financial situation at the mines was such as to require the utmost economy on the part of the Company's superintendent.

Under date of May 6, 1867, after De Lagnel departed for New York, Exall wrote: "I have, as far as I think safe, reduced the number of hands at the mines, keeping only a sufficient number to show that they are still being worked. I have a light force in the Christo; no improvement in the metal; a light force in the La Luz; the metal about the same. . . . I have discharged a greater portion of the Hacienda hands."

On the 10th of May, 1867, Garth wrote to Exall a letter in which, after expressing the hope that De Lagnel would soon arrive at New York, he said: "The affairs of the Company here are much embarrassed; a few of the directors have advanced all the money to carry on the operations and have been nearly ruined by it, and are not able to afford any further aid from here, and look anxiously to be reimbursed very soon from the products of the mine, and it is hoped that your best energies will be exerted to afford relief."

Again, under date of May 20, 1867, Garth wrote to Exall, and referring to De Lagnel's draft for $7500 said : " This draft

arrived on 2d April last, and was paid by one of the directors of the Company, as it was considered that was *surely the last* that would be needed, and we expected to return the money by an early remittance of bullion from Mexico. You can judge of our surprise and chagrin, when the last steamer arrived, instead of bringing Colonel De L. with some fruits of our works, a draft for $5000 in gold was presented for payment by Lees & Waller, drawn by De Lagnel, favor Bank California, and dated 10th April last, and of which we had not received any notice or advice whatever, and have not yet received any. As I had so often and fully advised the superintendent of the condition of affairs here and requested him not to draw further, I was much surprised that he did so, and that without giving any notice or reason for so doing. As it was found impossible to raise the means to pay this draft, it was protested and returned unpaid, and you must make some provisions for its payment when it gets back. I do trust that before that date you will have plenty of means to do so. I would now again repeat that I have made every effort possible to raise the money here and have failed, and I have advanced all I can possibly do, and the other directors have done the same; the stockholders will do nothing, and it is probable the Company will have to be sold out and reorganized."

This was followed by a letter from Garth to Exall of date May 30, 1867, in which it was said: "We wrote to you on the 20th instant, informing you that we had nothing from you or Colonel De Lagnel, but that a draft drawn by Colonel De L. from Mazatlan, 10th April last, had been presented, and there being no funds on hand, and no means here of meeting it, that it was protested and returned not paid; it is hoped by the time it gets back you will be prepared to meet it. Since my last letter Colonel De Lagnel has arrived and made known to us something of the state of things with you. I must confess that we are amazed at the results; it seems to me incredible that every one should have been so deceived in regard to the value of the ore, and I can but still hope that the true process of extracting the silver has not been pursued, and that before this time better results have been attained. . . . All ex-

penses must be cut down to the lowest point, and you and Mr. Cullins must try and bring this enterprise into paying condition if the thing is possible — at any rate, no further aid can be rendered from here, and what you need must come from the resources you now have. Neither must you run into debt; cut down expenses to amount you can realize from the mines. I cannot yet say what can be done in the future; no meeting of the stockholders has been held, and nothing done to pay off the debts here, now pressing on the Company. For the present, all I can say is that the whole matter is with you; take care of the interests and property of the Company; don't get it involved in debt, and advise us fully of what you are doing."

Garth wrote again, June 10, 1867: "We have not heard from you since Colonel De Lagnel left Mexico, but hope that you are well and getting along as well as could be expected. The account that Colonel De L. gave us of the quality of the ores on hand was most unexpected and a fearful blow to our hopes. We trust however that a fuller examination will show better results. We have in previous letters to you and to De Lagnel so fully informed you of the condition of affairs here that it is hardly necessary to say anything further on that subject. There is no money in the treasury, and we have no means of raising any, and a few of us have already advanced all that we can do, and you have been advised that the draft last drawn by De L., on 10th April, was returned protested, and I hope you will be able to take it up when it gets back promptly. Everything now depends upon you and upon your judgment, energy, prudence and good management of the resources in your hands, and we hope you will be able to command success."

So straightened were the circumstances of the Company at that time that it was sued in New York on promissory notes past due, (one of the notes being held by an assignee of Garth,) and it permitted judgment on them by default in July, 1867, for the sum of $53,653.50. Manifestly that suit was instituted with the consent, if not by the direction, of the officers of the Company who had charge of its affairs in New

York, who were aware of its financial embarrassments and knew that it must soon suspend business and go into liquidation.

By a letter of June 11, 1867, Garth was informed by Exall that he had been compelled to draw on him for $3000. The latter's letter of July 13, 1867, expressed regret that the draft made by De Lagnel before he left for New York could not be paid, and stated: "All your previous letters to me were to follow out the instructions given to Colonel De L. I took charge of affairs at a time when the expenditure of money was absolutely necessary to purchase supplies for the rainy season. Colonel De L. left me with only moderate means to buy these various supplies; pay't of sundry bills which were coming due, and pay of the workmen who had accounts of three, four and six months' standing."

On the 10th of July, 1867, Garth wrote to Exall: "I had this pleasure on 30th May and 10th June last, after the return of Colonel De Lagnel, and we had learned something of the condition of affairs in Mexico. In these, as well as in preceding letters, you were fully advised of the condition of the Company here; that there had been no funds in the treasury for a long time; that appeals had been made in vain for aid to the stockholders, and that the parties here who had made heavy advances to the Company were anxious for its return, and refused to make any further payments; and that the draft for $5000 drawn on me as treasurer by Colonel De Lagnel, on the 10th April last, had been protested and returned to California, and, we suppose, to parties in Mazatlan who advanced the money on it, and who would have to look to you for payment of same; and we expressed the hope that by that time you would have taken out sufficient money to meet it and all other expenses, and hoped soon to have a remittance of bullion from you to aid in payment of the large indebtedness here. . . . You will see, from all my letters, that no further aid can be given you from here, and that you must rely upon the resources you now have, and which, we think, ought to be ample to pay off the debts and to sustain you in current expenses, which you should cut down to the

lowest possible point. . . . Don't run into debt or get into difficulty with the authorities, if there are any such things existing; but at the same time be firm in maintaining your rights, and don't submit to imposition except by force, and then make a legal and formal protest as a citizen of the United States and as an American company duly organized and prosecuting a legitimate business under the protection of the law, and our rights will be protected by our Government."

Garth wrote again on the 20th of July, 1867 : "The steamer is just starting, and I have only time to say that your letter of the 11th, by private hand, has been rec'd, advising us that you had drawn on me for $3000 gold. In former letters you will have learned the condition of things here, and that there is no money to pay same, and that former dr'ft of De Lagnel has been returned unpaid, and that you were urged to try and get along with what resources you had. These letters, no doubt, reached you in time to prevent your drawing, as no draft has been presented, and we hope by this time there is no necessity for doing so."

Under date of October 6, 1867, Exall wrote to Garth: "By this steamer I am in receipt of yours of 10th and 20th of July and 10th of August. I was much disappointed that my urgent demand for money was not favorably answered. I have complied with the requests in your various letters in reference to giving you exact information concerning affairs here. I now have to urge you to send me means. I have heretofore been keeping above water by using the stock which I fortunately had on hand ; that is now entirely exhausted. I have neither money, stock or credit. This latter I would not use even if I had it, as in this country it is an individual obligation and no company affair. Now, you must either prepare to lose your property here or send me money to hold it (and that speedily) and pay off debts of the concern. I have worked as economically as possible and have cut down expenses to the lowest point. . . . I am working the mines with as few hands as possible. What little good metal is taken out amounts to almost nothing. The $5000 draft of De Lagnel's was sent to a house in this place to be collected, with instruc-

tions to seize the property in case it was not paid. It troubled me a great deal, and I had much difficulty in warding it off. The concern to whom the draft was sent showed me his instructions and also the original draft. Fortunately for the Company there was a flaw in the draft; De Lagnel failed to sign his position, as superintendent of the La Abra Silver Mining Company; simply signed his name, making it an individual affair. This was the only thing that kept them from seizing the property. I told them they could do nothing with the property here, as the Company were not obligated on the draft. I have exhausted all the ore that I had on hand that was worth working. That which I worked was very poor and the yield small. The La Luz, on the patio, won't pay to throw it into the river. I have had numerous assays made from all parts of each pile; the returns won't pay. Amparas are not now granted, and mines are to be held only by working. I am compelled to keep men in mines which yield nothing, merely to hold them. This I can do no longer, as I have nothing to give the men for their labor, and must now take the chances and leave the mines unprotected."

The same letter contains a statement as to the situation which contrasts most strangely with the charge that the Company was prevented from successfully working its mines by the conduct of the Mexican authorities. That statement was: "By next steamer will send you full statements of past months. The returns from Durango were small. I turned it over to E. P. & Co., as I was owing them. There is no difficulties about authorities, boundaries or anything else concerning the mines and hacienda, provided there is money in hand, and *money must* be sent. I hope I have urged this point sufficiently so that you may see fit to send me something to hold the mines. I should be sorry to see them lost on this account. Please telegraph me if you intend sending money? I fear that before I can get a reply to this something may have occurred. Of course, Colonel De Lagnel informed you the conditions and terms on which I took charge of affairs here, which was the same that he was getting, and if I had known at the time what difficulties I was going to have in procuring

means to keep the concern in motion, I would have refused on any terms. I am much in need of money, as I wish to use it here. I will, in a month or so, draw on you through Wells, Fargo & Co., San Francisco, for $1500 — please inform me by earliest opportunity that you will meet the draft. . . . I hope that before this reaches you some steps will have been taken to procure means to operate with."

On the 10th of October, 1867, Garth wrote to Exall: "I am very sorry to say that it is not possible to aid you from here, and that you must rely entirely upon the resources of the mines and mill to keep you going and to relieve you of debts heretofore contracted. It is not possible for us to direct any particular course for you, but only to urge you to try and work along as well as you can, cutting down expenses and avoid embarrassing yourself with debts. The Bank of California has again sent Colonel De Lagnel's draft here for collection, but it was not possible to pay same, and it will have to return to Mexico, and we do hope you will be able to make some satisfactory arrangement to pay it."

Under date of November 17, 1867, Exall wrote to Garth from Mazatlan: "Yours of the 30th September is just at hand, and contrary to my expectations, contains nothing of an encouraging nature. I expected after having previously written so positively in reference to the critical state of affairs with me, that you would have sent me by *this mail* some means to relieve me from my embarrassing position. I have in former letters laid before you the difficulties under which I was laboring and begged that you would send me means, and was relying much on the present mail, expecting that some notice would have been taken of my urgent demands for assistance to protect the property belonging to the Company. To add to my further embarrassment, Mr. Cullins, whose time expired on the 16th inst. — since my leaving Tayoltita — (I left there on the 10th for this point), intends to commence suit in the courts here for his year's salary. I am endeavoring to get him to delay proceedings until the arrival of the next steamer (don't know as yet if I will succeed in getting him to delay), when I hope you will have seen the necessity of acting

decidedly and sending means to prosecute the works and pay off the debts of the Company, or abandoning the enterprise at once. Nothing can be done without a further expenditure of money. I am now doing little or nothing in the mines, and will, when I return, discharge the few men who are now at work in them. This I am compelled to do, as I have no money, and my stock is almost entirely exhausted, and I fear if money isn't very soon sent some of the mines will become open to denouncement. In my last letter I mentioned the amount required for immediate demands, $3000, which must be sent out. By next steamer Mr. Elder, Slone and Cullins, if paid off will sail for San Francisco; if not paid off, suit will be commenced, and as I have no means to defend the case, fear it will go against me. When these parties leave, the hacienda will be left almost entirely alone, there being only myself, Mr. Granger, who I am also owing, and I away most of the time. What you intend doing must be done promptly. Please send me Mr. Cullins' contract with you. The political state of the country just now is rather discouraging. I hope by the time this reaches you you will have rec'd statement sent. Everything at mines as it was when I last wrote, only more gloomy in appearance on ac't of not being able to employ the people and put things in operation. *Please do something immediately,* and inform me as speedily as possible."

Still relief did not come to Exall and he again wrote to Garth from Mazatlan, under date of December 18, 1867, a most urgent letter. It is here given in full: "I arrived here a few days since. Received by steamer yours of October 10, informing me of your inability to send me the means to operate with and meet my obligations. I have in previous letters expressed the condition of affairs with me, and begged that you would do something. Thus far I have been able to protect your interests here, but affairs have gotten to such a point that I am unable to do so longer without money. Mr. Cullins, who I informed you in a former letter would leave, insisted upon doing so by this steamer. He demands a settlement, otherwise he will immediately commence suit, and had made preparations to do so. To keep the matter from the courts

I was compelled to borrow money to pay him off. The balance due him, and the amount I had to borrow here, was $1492. He has troubled me a great deal — has been exceedingly unreasonable. On yesterday the agent of the Bank of California informed me that he received the draft by the last steamer (which arrived a few days ago), and would immediately commence legal proceedings, and sent the draft on to the courts here. I am utterly unable to oppose them; first, I have no means, and, again, I am not your agent here, never having received a power of attorney from you, which will be necessary, for I cannot act in these courts without it. The Bank of California—— and will do something to recover the amount of the draft before the amount is doubled by the expenses. For God's sake telegraph to pay them. Matters of this nature once getting in these courts it takes large sums to oppose them. The first steps taken by the courts will be to send some one to the hacienda to see to and secure everything there. This will, of course, stop everything and make it impossible for me to protect your interests. For your own sake in the matter pay them before things go further. My position is extremely embarrassing, and I know not what to do, and will have to be guided entirely by circumstances. I will, of course, do everything in my power, and may have to act in a very cautious manner, and will probably act in a manner which may occasion censure. Now, all I ask of you is to judge my actions justly, and consider my circumstances, and believe I am doing the best for your interests. I am doing nothing at the mines, and have only one person left with me. Please attend to this matter promptly. I am writing very hurriedly, as there is a war steamer just leaving for San Francisco, which will arrive there some days prior to the regular mail. I leave for the mines in a few hours. Attend to this at once and telegraph me."

Exall still failed to hear anything of an encouraging character from the Company. He again wrote most urgently to Garth on the 24th day of January, 1868, as follows: "I came down to meet steamer from San Francisco, in hopes of receiving letters from you; I received none, and now, being entirely

out of funds and stock, and being sued by agents from Bank of California for the payment, have to let things take their own course, as I am unable longer to protect your interests here. In previous letters I have given you a full and detailed account of affairs here, and such frequent repetitions I find useless, and will simply state that I am doing nothing whatever at the mines, and cannot until I receive money to operate with. I haven't means to protest now and they are liable to be denounced at any moment. Some months since I wrote you for titles; the government demanded them; they have not been received. By steamer I sent you a telegram from San Francisco; no reply. The parties I sent the dispatch to in San Francisco sent it on to New York. I am owing considerable and no means of paying. What is your intention? Is it to let your interests here go to the dogs? You have either to do this or send money out to protect them. If by next steamer I receive no assistance from you, I intend leaving for the East. I will go via San Francisco, will from there telegraph you what further steps I shall take. I have been doing everything in my power to keep the Bank of California from getting possession; thus far have succeeded, but can prevent them no longer, and fear they will eventually have their own way. Mr. Cullins (who is not the man he was represented to be) left by last steamer. I have only one man now; am compelled to keep some one. Please telegraph me in San Francisco, care of Weil & Co., immediately on receipt of this. You can judge by what has been done in New York and send me whether or not I may have left. Please let me know your intentions."

The situation had become financially so discouraging to Exall that he determined to leave the mines and return to New York. So under date of February 26, 1868, he wrote to James Granger, who sometimes called himself Santiago Granger and who was at the mines, this letter: "As circumstances are of such a nature as to compel me to leave for San Francisco, and probably for New York to inquire into the intentions of this company, I place in your hands the care and charge of the affairs of the La Abra S. M. Co.; together with

its property. You are invested hereby with all power confided to me, of course, acting in all your transactions with an eye to the interests of the Company. This will, to you, should occasion require it, be ample evidence of the right possessed by you to act in their behalf." Notwithstanding the execution of this paper, Exall testified in his deposition taken before the Commission in 1874 as follows: "I did not leave said mines, hacienda or property in charge of said Granger, or any other person, nor did I give any charge, control, power or authority of or over the same, or any part of the same, to him, or any one else, and if he, or any other person, has taken charge or control of said mines, hacienda and property, or of any of it, or has sold, used or in any way disposed of any of it, each of such acts was without any power or authority, or right whatever to do so, so far as any act by me or for me, or on my part, as superintendent or otherwise, is concerned." We also find in the record a letter from Exall, written from New York to Granger under date of May 8, 1868, in which the writer says: "Of course, on the first day of my arrival here, I saw nothing of the Company. The day after I went down and saw Garth. Had a long talk concerning affairs, and, contrary to our expectations, gave me no satisfaction; didn't seem to intend to do anything more. I have seen him several times, but have got nothing from him of an encouraging nature. He seems disgusted with the enterprise, and, so far as regards himself, intends to do nothing more, or have nothing more to do with it. . . . I wish I could send you some means to get along with, knowing you must be having quite a rough time, but am unable. I expected to be paid up here; its not having been done plays the devil with my arrangements." Among the letters now produced in evidence is one from Granger, written from Tayoltita under date of August 12, 1868, to Señor Don Remegio Rocha. That letter was in these words: "I have received the communication calling upon this Company to pay $52.50 each month for taxes imposed by the legislature of the State, and presume it to be correct; but as I am only acting in the absence of the superintendent, and as there is no money nor

effects to pay this tax, I beg you to wait until the month of November, at which time said superintendent is to come, and then the sums due by this Company on account of this tax will be paid."

From the above and other evidence in the record it is certain that before the La Abra Company ceased to work the mining property it had become utterly bankrupt, and that its abandonment of all operations at the mines was due to its inability from want of funds to carry them on and to the belief, founded upon the experience of two years and more, that the mines, if not entirely worthless, were not of sufficient value to justify its owners in proceeding further in their development. If the proper working of the mines while Bartholow, De Lagnel and Exall were successively in charge of them was prevented by the acts or omissions of duty on the part of the public authorities of Mexico, surely that fact would have been disclosed by the letters or reports made to the Company by its several superintendents. The demand made during that time by the Company's representatives in charge of the mines was not for military or civil protection, but for the money needed to develop the property and to meet the debts incurred at the mines during the progress of the work there. We do not doubt that the situation was accurately described by Exall when in the above letter to Garth of October 6, 1867, he reported that "there are no difficulties about authorities, boundaries or anything else concerning the mines and hacienda, provided there is money on hand, and *money must be sent;*" and when in his letter of November 17, 1867, he endeavored to impress Garth with "the necessity of acting decidedly and sending means to prosecute the works and pay off the debts of the Company, or abandoning the enterprise at once." In that condition of affairs, it is not strange that Exall in the letter of January 24, 1868, just before he left Mexico for New York, wrote to Garth : "I am owing considerable and no means of paying. What is your intention ? Is it to let your interests here go to the dogs? You have either to do this or send money out to protect them." We have seen that Garth, as the representative of the Company, in

a letter to Exall, dated July 10, 1867, warned him against running into debt and getting into difficulty with the authorities, "if there are any such things existing;" "but," he continued, "at the same time be firm in maintaining your rights, and don't submit to imposition except by force, and then make a legal and formal protest as a citizen of the United States and as an American company duly organized and prosecuting a legitimate business under the protection of the law, and our rights will be protected by our Government." Now, it does not appear that there was any formal protest before the United States Consul at Mazatlan by any representative of the Company to the effect that the Mexican authorities had so acted or failed in duty as to compel it to abandon its property in Mexico. If the Company's superintendents had any such view of the situation when they returned to the United States and gave an account of their management of the property, how natural it would have been for the Company, in some formal way, to have promptly brought the whole matter to the attention of the Government of the United States, and sought its aid in order to have justice done to them by the Republic of Mexico. No such course was taken, and we cannot doubt, in view of the evidence adduced after the Commission made its award, in connection with the evidence before that tribunal, that the idea of attributing the losses of the Company to the wrongful conduct of the Mexican authorities never occurred to the Company until after the organization of the Commission, long after the arrival of Exall in New York. In March, 1870, the Company for the first time gave notice to the Department of State that it had any claim against the Republic of Mexico. It then claimed only $1,930,000. A few months later it increased its claim to $3,000,030, and before the Commission concluded its labors it amended its claim and fixed it at $3,962,000.

One point in connection with the letter-impression book cannot be passed without notice. It is contended that what passed between Garth and the superintendents in charge of the property, in the form of letters or reports by the latter to the former, was not admissible in evidence against the Com-

pany. This proposition cannot be sustained. The superintendents placed at the mines were its representatives in charge of the Company's property. What they did at the locality of the property in and about its management were the acts of the Company, so far as those acts were within the scope of the business intrusted to them. So what they said while engaged in managing and with reference to the management of the property, particularly what they reported to their principal in respect to the condition of the property and their acts in the course of the business, constitute part of the *res gestæ* of the controversy between the parties. The vital inquiry in this cause is whether the Company's representatives at the mines were prevented by the Mexican authorities from developing and working them, whereby it was forced to abandon the property. Surely, what those representatives said and did or forebore to do at the mines, bearing upon that inquiry, would have been part of the *res gestæ* and admissible in evidence against the Company. Upon like ground, their written reports or letters to the Company while in charge of the property and in respect of its management are admissible in evidence so far as they bear upon the same inquiry and constitute a part of the *res gestæ*. The rule, we think, is accurately stated by Greenleaf, who, after saying that the act or declaration of each member of a partnership in furtherance of the common object of the association is the act of all, because by the very act of association each one is constituted the agent of all in respect of the common business, says: " A kindred principle governs in regard to the declarations of agents. The principal constitutes the agent his representative, in the transaction of certain business; whatever therefore the agent does, in the prosecution of that business, is the act of the principal, whom he represents. And ' where the acts of the agent will bind the principal, there his representations, declarations and admissions, respecting the subject-matter, will also bind him, if made at the same time, and constituting part of the *res gestæ*.' They are of the nature of original evidence, and not of hearsay; the representation or statement of the agent, in such cases, being the ultimate fact to be proved, and not an admission of

some other fact. But, it must be remembered, that the admission of the agent cannot always be assimilated to the admission of the principal. The party's own admission, whenever made, may be given in evidence against him; but the admission or declaration of his agent binds him only when it is made during the continuance of the agency in regard to a transaction then depending *et dum fervet opus.* It is because it is a verbal act, and part of the *res gestæ,* that it is admissible at all; and therefore it is not necessary to call the agent himself to prove it: but wherever what he did is admissible in evidence, there it is competent to prove what he said about the act while he was doing it; and it follows that where his right to act in the particular matter in question has ceased, the principal can no longer be affected by his declarations, they being mere hearsay." 1 Greenl. Ev., § 113. See also Story on Agency, § 134.

Upon a careful scrutiny of all the evidence we are of opinion that so far from the Mexican Government being legally responsible for the losses falling upon the Company, its investment was without profitable results, because the Company did not have or did not furnish to its superintendents at the mines the funds required for their successful development, and did not find the property to be as valuable as they had supposed. All this is apparent from the reports made from time to time to the Company by its superintendents, duplicate originals of which are to be found in the letter-impression book which was not before the Commission. The identity of that book is fully established and the Mexican Republic is not fairly chargeable with negligence in not having discovered it sooner. It is certain that that Government, within a reasonable time after it received the book, delivered it to the Department of State, and called attention to the important and vital facts disclosed by it, so that the United States could take such action as its sense of duty suggested.

Our conclusion is that the question stated in the act of 1892 — whether the award in question "was obtained as to the whole sum included therein, or as to any part thereof, by fraud effectuated by means of false swearing or other false

and fraudulent practices on the part of the said La Abra Silver Mining Company, or its agents, attorneys or assigns" — must be answered in the affirmative as to the whole sum included in the award. That Company placed before the Commission a state of facts that had no existence, and which we are constrained by the evidence to say its principal representatives must have known had no existence, but which being credited by the Commission under the evidence adduced before it brought about the result complained of in the bill. The whole story of losses accruing to that Company by reason of wrongs done by the authorities of Mexico, is, under the evidence, improbable and unfounded. We do not wish to be understood as saying that the Company did not meet with losses on account of its investments in this mining property. But we do adjudge that it had no claim which, upon any principle of law or equity, it was entitled to assert against the Republic of Mexico.

The decree below is                                  *Affirmed.*

MR. JUSTICE GRAY did not hear the argument on the facts and took no part in their consideration. MR. JUSTICE MCKENNA took no part in the decision.